Jeffery S. SEELBACH, Appellant,

v.

Justin Troy CLUBB, Thomas J. Clubb, and Ed Moore, Jefferson County Commissioner Precinct No. 4, Appellees.

No. 06–98–00104–CV.

Court of Appeals of Texas, Texarkana.

Submitted June 25, 1999.

Decided Nov. 19, 1999.

Robert Bruce Dunham, Bruce Wayne Cobb, Beaumont, for appellant.

J. Mitchell Smith, Phil Dunlap, Wells, Peyton, Greenberg & Hunt, Beaumont, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

Jeffery Seelbach sued Justin Troy Clubb, Thomas Clubb, and Jefferson County seeking damages and injunctive relief for obstruction of a public right-of-way. After a nonjury trial, the trial court entered a judgment granting Seelbach a permanent injunction against the Clubbs, but denied Seelbach's claims for actual and punitive damages, attorney's fees, and court costs. The court entered a take-nothing judgment in favor of Jefferson County. Seelbach does not appeal the judgment granted in favor of Jefferson

County. Seelbach does, however, appeal the trial court's judgment denying him actual and punitive damages, court costs, and attorney's fees in his suit against the Clubbs.

First, Seelbach contends the trial court erred in its findings of fact that he suffered no special injury or actual damages. Alternatively, he argues the trial court's findings of fact that he suffered no special injury and no actual damages were against the great weight and preponderance of the evidence. Second, he contends the trial court erred in denying his motion to modify the judgment. Third, he contends the trial court erred in its conclusions of law by finding that he was not entitled to actual damages, punitive damages, attorney's fees, or court costs from the Clubbs. Alternatively, he argues the trial court's conclusions of law as to punitive damages and attorney's fees were against the great weight and preponderance of the evidence. Last, he contends the trial court's amended finding of fact number 20 is contrary to the evidence as a matter of law.

On June 28, 1996, Seelbach entered into an earnest money contract to buy 101 acres of land (the McCoy tract) from Jim and Francis McCoy. The closing date was set for August 30, 1996. At the time of trial, in December of 1997, Seelbach had not yet closed on the entire 101–acre purchase and had extended the closing date. Seelbach's obligation to close under the contract was conditioned upon the McCoys providing to Seelbach that any obstructions to his right of ingress and egress to the property be resolved to his satisfaction. The only way to access the McCoys' land was by a designated public right-of-way.

To get to their land, the McCoys had to go through two locked gates on the public right-of-way, one on the eastern portion of the Clubb tract and one on the western portion of the Clubb tract. The McCoys had a key to open the locked gates, but Seelbach did not. About 100 yards east of the McCoy tract was a drainage ditch running north and south through the public right-of-way. The drainage ditch was impassable by car, so the McCoys had to park their car and walk to their property. The McCoys did not live on the property, and no house had been constructed on the property.

Justin Clubb and Thomas Clubb owned a 143–acre tract of land adjacent to and east of the McCoy tract (the southern Clubb tract). Justin Clubb also owned approximately forty-three acres of land to the north of the public right-of-way, slightly east of the McCoy tract (the Justin Clubb tract). Justin's land was bounded to the north, east, and west by fences, but the southern boundary, the boundary abutting the public right-of-way, was not fenced. The Clubbs are rice farmers and cattlemen. Both Thomas and Justin admitted that sometimes their cows were in the public right-of-way.

After entering into the earnest money contract with the McCoys, Seelbach testified that he told Thomas Clubb that the locked gates were interfering with his ability to close on his real estate contract. However, Thomas Clubb disputes that Seelbach told him the gates were interfering with his contract. The evidence as to whether Seelbach told Thomas to remove the gates at this time is also in dispute. Thomas told Seelbach that he would let Jefferson County remove the fences and the gates. During an earlier conversation, Thomas told Seelbach that the gates were to keep the cattle in and to keep other people out.

Seelbach wrote a letter to Ed Moore, a County Commissioner in Jefferson County, asking him to take down the gates. Commissioner Moore referred the matter to the county engineer and the county legal department. On September 30, 1996, Commissioner Moore sent a letter to the Clubbs telling them that it was not legal to maintain gates across the right-of-way and that the gates needed to be removed. The Clubbs' attorney sent two letters to Commissioner Moore offering a compromise of placing cattle guards in the right-of-way or having the right-of-way declared a third-

class road.[1] (Declaring the right-of-way a third-class road would allow the gates to stay in place.) Commissioner Moore testified that the Clubbs' effort to negotiate a compromise was a reasonable reaction to his letter and that the gates could only be taken down with the approval of the Commissioners Court.

While the county and the Clubbs were negotiating, Seelbach had both a land survey and an environmental survey done on the McCoys' property. On December 26, 1996, Seelbach sent a letter to the Clubbs demanding that the gates be taken down within twenty-four hours and demanding that the Clubbs pay him for the monetary damages he had suffered as a result of his failure to close on the McCoy tract of land on August 30, 1996. He also sent a letter to Commissioner Moore demanding removal of the gates.

The gates were not removed, and Seelbach filed suit against the Clubbs in February of 1997. The Clubbs filed an answer and a plea to the court's jurisdiction contending that Seelbach did not have standing to sue. On April 17, 1997, Seelbach purchased a one-acre undivided interest in the McCoy tract. Subsequently, Jefferson County and Commissioner Moore were added as parties to the suit. Trial was to the court in December of 1997.

In his first point of error, Seelbach contends the trial court erred in its findings of fact that he suffered no special injury (amended finding of fact number 23) and no actual damages (amended finding of fact number 22). Alternatively, he argues the trial court's findings of fact that he suffered no special injury and no actual damages were against the great weight and preponderance of the evidence.

■ Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict.[2] However, a trial court's findings of fact are not conclusive when a complete statement of facts appears in the record, as it does here.[3] A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's verdict.[4]

When confronted with both legal and factual sufficiency points, we must first examine the legal sufficiency point.[5] An appellant attacking the legal sufficiency of an adverse finding on an issue on which the appellant has the burden of proof must demonstrate on appeal that the evidence conclusively establishes all vital facts in support of the issue.[6] In reviewing a matter of law point, the reviewing court employs a two-prong test. The court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary.[7] If there is more

1. The portion of the public right-of-way in dispute was not a public roadway and had never been classified or dedicated as a public road by Jefferson County. Further, the disputed portion of the road was not maintained by Jefferson County.

2. *Mohnke v. Greenwood*, 915 S.W.2d 585, 589 (Tex.App.-Houston [14th Dist.] 1996, no writ) (citing *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.)).

3. *Greenwood*, 915 S.W.2d at 589; *see Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.App.-Houston [14th Dist.] 1985), *writ ref'd n.r.e. per curiam*, 699 S.W.2d 199 (Tex. 1985).

4. *Greenwood*, 915 S.W.2d at 589 (citing *Criton Corp. v. Highlands Ins. Co.*, 809 S.W.2d 355,

358 (Tex.App.-Houston [14th Dist.] 1991, writ denied); *Zieben v. Platt*, 786 S.W.2d 797, 799 (Tex.App.-Houston [14th Dist.] 1990, no writ)).

5. *Greenwood*, 915 S.W.2d at 589 (citing *Texmarc Conveyor Co. v. Arts*, 857 S.W.2d 743, 745 (Tex.App.-Houston [14th Dist.] 1993, writ denied)).

6. *Greenwood*, 915 S.W.2d at 589 (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Smith v. Central Freight Lines, Inc.*, 774 S.W.2d 411, 412 (Tex.App.-Houston [14th Dist.] 1989, writ denied)).

7. *Greenwood*, 915 S.W.2d at 589 (citing *Sterner*, 767 S.W.2d at 690).

than a scintilla of evidence of probative force supporting the finding, then the finding must be upheld.[8] More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."[9] If there is no evidence to support the finding, the reviewing court must then examine the entire record to determine if the contrary proposition is established as a matter of law.[10] If the proposition asserted by the appellant is established as a matter of law, the point of error will be sustained.

When a party who has the burden of proof attacks the factual sufficiency of the evidence to support an adverse finding, he must demonstrate that the finding is against the great weight and preponderance of the evidence.[11] In reviewing such a challenge, the appellate court must examine the entire record,[12] and set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust.[13]

When undertaking a factual sufficiency review, the court of appeals may not set aside fact findings merely because it could have drawn different factual findings and legal conclusions from the evidence.[14] The appellate court cannot retry the case or otherwise substitute its judgment or opinion for that of the trier of fact.[15] The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the appellate court should not act as a thirteenth juror in assessing the evidence and the credibility of the witnesses.[16]

■ The Clubbs contend that Seelbach is barred from recovering any alleged damages prior to Seelbach's purchase of the undivided one-acre interest on April 17, 1997, because Seelbach lacked standing to sue and had yet to suffer any compensable injury.

■ Seelbach argues that he suffered actual damages as a result of the delay in closing, that he had standing to sue because the earnest money contract gave him standing, and that he later acquired a one-acre undivided interest in the McCoy tract. Seelbach directs our attention to *City of Garland v. Wentzel*[17] in support of his contention that the earnest money contract gave him standing to sue. In *Wentzel,* the court held that the plaintiff could recover for damages done to the value of the land he had purchased under a land sales contract (contract for deed). The plaintiff and his family moved onto the land immediately after executing the contract. The plaintiff was responsible for paying the taxes on the land and maintaining insurance. Upon payment of the entire indebtedness, the seller would execute a deed to the plaintiff.

8. *Convalescent Serv., Inc. v. Schultz,* 921 S.W.2d 731, 734 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (citing *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989)).

9. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

10. *Greenwood,* 915 S.W.2d at 589 (citing *Sterner,* 767 S.W.2d at 690).

11. *Greenwood,* 915 S.W.2d at 589 (citing *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275 (Tex.App.-Amarillo 1988, writ denied)).

12. *Greenwood,* 915 S.W.2d at 589 (citing *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986)).

13. *Greenwood,* 915 S.W.2d at 589 (citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Zieben,* 786 S.W.2d at 799).

14. *Greenwood,* 915 S.W.2d at 589 (citing *First Baptist/Amarillo Found. v. Potter County Appraisal Dist.,* 813 S.W.2d 192, 196 (Tex.App.-Amarillo 1991, no writ)).

15. *Greenwood,* 915 S.W.2d at 589 (citing *Baptist Mem'l Hosp. Sys. v. Smith,* 822 S.W.2d 67, 81 (Tex.App.-San Antonio 1991, writ denied)).

16. *Greenwood,* 915 S.W.2d at 589–90 (citing *Rego Co. v. Brannon,* 682 S.W.2d 677, 680 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.)).

17. 294 S.W.2d 145 (Tex.Civ.App.-Dallas 1956, writ ref'd n.r.e.).

In the event any portion of the interest or principal was not paid when due, the contract of sale would be subject to forfeiture by the seller. *Wentzel* is distinguishable from the present facts in many respects,[18] the most important being that the plaintiff in *Wentzel* had an equitable title or interest [19] in the land while the earnest money contract here only gave Seelbach the right to purchase the land in the future. The language of the earnest money contract states, "Jim McCoy and Francis McCoy (Seller) agrees [sic] to sell and convey to Jeffery S. Seelbach (Buyer) and Buyer agrees to buy from Seller the property described below." This is not the language *of sale* but of an agreement *to sell* and can be contrasted with language in a real estate sales contract stating, "Seller sells and agrees to convey, and Buyer purchases and agrees to pay for, the tract of land. . . ." [20] A contract *to* sell real property is an agreement for a sale in the future, either absolutely or on the happening of some contingency or the performance of some condition.[21]

◼ Further, the execution of the earnest money contract here was not a sale because case law holds that when a seller's only contractual remedy in the event of a purchaser's default is the retention of the earnest money, the agreement is an option, rather than a bilateral agreement, for the sale and purchase of land.[22] The parties executed an addendum to the earnest money contract stating that the buyer's and seller's sole and exclusive remedy for any unintentional material breach of the contract was the return of the earnest money.

◼ Last, an earnest money contract does not give the future purchaser the right to occupy and use the land until the stated time for delivery of possession, which is usually at closing. The McCoys were to deliver possession of the premises to Seelbach at closing, and the addendum stated that Seelbach had the right to enter and be on the premises prior to closing only for the purposes of inspection and testing.

Because the earnest money contract was not a sale, but was an agreement to sell, because Seelbach only had an equitable right to buy the land, and because Seelbach had no right to possession of the land until closing, Seelbach does not have any basis to recover any actual damages for obstructed ingress and egress to the land until April 17, 1997, when he purchased an undivided one-acre interest in the McCoy tract.

◼ The gist of Seelbach's complaint is that the Clubbs interfered with his right to complete the purchase under the contract by August. Seelbach contends that this delay prevented him from building a house on the land. In Texas, a party bringing suit for tortious interference with a contract must prove four elements: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's damage; and (4) actual damage or loss occurred.[23] Once the plaintiff establishes a prima facie case of tortious interference, the defendant can prevail only by proving his act was either

**18.** In *Wentzel,* the plaintiffs were in possession of the land, the contract was a contract for deed, and the plaintiffs were paying monthly installments, taxes, and insurance on the land. Here, Seelbach was not in possession of the land and the McCoys were not obligated to deliver possession to him until closing, the contract was an earnest money contract and not a contract for deed, Seelbach was not obligated to make any payments until closing, and he was not responsible for paying the taxes on the land.

**19.** *Wentzel,* 294 S.W.2d at 147.

**20.** 16 HERBERT S. KENDRICK & JOHN J. KENDRICK, JR., TEXAS TRANSACTION GUIDE: LEGAL FORMS § 70.200[2] (1999).

**21.** *See* 63 TEX. JUR. 3D *Real Estate Sales* § 2 (1988).

**22.** *See Scott v. Vandor,* 671 S.W.2d 79, 84 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Broady v. Mitchell,* 572 S.W.2d 36, 40 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.).

**23.** *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 664 (Tex.1990).

justified or privileged.[24] A plaintiff can recover exemplary damages if he can show the interference was malicious.[25]

The first element of tortious interference with a contract requires that a valid contract exists.[26] Here, a valid earnest money contract existed.

■■■ The second element of tortious interference with a contract requires a willful and intentional act of interference.[27] Contractual interference encompasses actual inducement or procurement of a contract breach and all other invasions of contractual relations. Accordingly, such interference includes any act which retards, makes more difficult, or prevents performance.[28] Interference with a contract rises to a tortious level only if it is intentional.[29] The evidence is in dispute as to whether Seelbach told Thomas Clubb that their gates were interfering with his ability to close on his contract. Seelbach testified that he told Thomas the gates were interfering with his contract, but Thomas Clubb testified that he had no knowledge of any earnest money contract between Seelbach and the McCoys prior to the lawsuit. Thomas did testify that in one conversation, Seelbach told him he was trying to buy the property, but this testimony alone does not show that Thomas knew a contract for its purchase existed between Seelbach and the McCoys.

Justin Troy Clubb, Thomas Clubb's son, testified that he had no knowledge of the contract until he got a letter from Seelbach in December of 1996. The letter states that Seelbach had been unable to close on his real estate transaction. Justin Clubb testified, however, that he was aware Seelbach was "looking at buying" the property in November of 1996. Again, this testimony alone does not show Justin knew Seelbach and the McCoys had entered into a contract to purchase the land. In its amended conclusion of law number 1, the court stated that no willful interference with the McCoy/Seelbach contract was committed by the Clubbs. Having examined this conclusion of law, we determine that it may be more properly termed a finding of fact even though it is contained within conclusions of law.[30] In its amended conclusion of law number 30, the trial court found that the Clubbs did not intentionally, willfully, or maliciously interfere with the McCoy/Seelbach contract, and that Seelbach was to take nothing on his tortious interference claim against the Clubbs.

■■■ If an appellant does not challenge the trial court's findings of fact on appeal, these facts are binding on both the party and the appellate court.[31] Accordingly, it is incumbent on the appellant to attack the findings by appropriate legal and factual sufficiency points of error.[32] Seelbach does not challenge on appeal the trial court's finding in its amended conclusion of law number 11 that no willful interference with the McCoy/Seelbach earnest money contract was committed by the

---

**24.** *Bellefonte Underwriters Ins. Co. v. Brown,* 663 S.W.2d 562, 573 (Tex.App.-Houston [14th Dist.] 1983), *aff'd in part, rev'd in part,* 704 S.W.2d 742 (Tex.1986); *Armendariz v. Mora,* 553 S.W.2d 400, 405 (Tex.Civ.App.-El Paso 1977, writ ref'd n.r.e.).

**25.** *Bellefonte Underwriters,* 663 S.W.2d at 573.

**26.** *Juliette Fowler Homes,* 793 S.W.2d at 664.

**27.** *Id.*

**28.** *Bellefonte Underwriters,* 663 S.W.2d at 573; *Tippett v. Hart,* 497 S.W.2d 606, 611 (Tex.Civ. App.-Amarillo), *writ ref'd n.r.e. per curiam,* 501 S.W.2d 874 (Tex.1973).

**29.** *See Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex.1992).

**30.** *See Benavides v. Warren,* 674 S.W.2d 353, 363 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.).

**31.** *Wade v. Anderson,* 602 S.W.2d 347, 349 (Tex.Civ.App.-Beaumont 1980, writ ref'd n.r.e.).

**32.** *Lovejoy v. Lillie,* 569 S.W.2d 501, 504 (Tex. Civ.App.-Tyler 1978, writ ref'd n.r.e.).

Clubbs. Therefore, Seelbach has waived any point of error he may have had with regard to the trial court's finding of noninterference. Further, because the court made an express finding of noninterference and it was not challenged, we must presume factual findings in support of the trial court's judgment on the other elements of tortious interference with a contract;[33] therefore, we need not address the other three elements of tortious interference.

However, even if Seelbach's point of error stating that the trial court erred in finding he suffered no actual damages was sufficient to preserve error on appeal on the trial court's finding of noninterference, Seelbach has not shown that the interference was intentional and, as will be discussed later in the opinion, Seelbach did not present sufficient evidence on actual damages.

 Next, we turn to whether the trial court erred in finding Seelbach suffered no special injury after he acquired his one-acre interest in the McCoy tract. Seelbach argues that he suffered a special injury because a person who occupies land adjoining a public highway has a right to unobstructed access to that highway. Seelbach contends that the undisputed evidence shows the Clubbs obstructed the right-of-way, as evidenced by amended finding of fact number 7 stating that the Clubbs obstructed the right-of-way.

One who owns property abutting on a street has not only the right in common with the public of using the street from end to end for the purpose of passage, but also has the *individual right of free and convenient passage from and egress to his property, which is a private and*

personal *right unshared by the community,* and if taken away or materially impaired by an unauthorized obstruction of the highway[,] such owner sustains a *special injury* different in character from that sustained by the public which will entitle him to maintain an action *to enjoin the continuance of the same.*[34]

In *Quanah Acme & P. Ry. Co. v. Swearingen,*[35] the court stated

A way over land set apart for public travel in a town or city is a street, no matter what it may be called.... An abutting owner has rights not shared by the public at large, special and peculiar to himself, which arise out of the very relation of his lot to the street in front or alley in the rear of it.... And it is well settled that equity will grant relief to a party entitled to a right of way over a street, and protect him in the enjoyment thereof, *by restraining the erection of obstructions thereon.*

 After acquiring the one acre, Seelbach was entitled to the unrestricted right of enjoyment, use, and disposal of the property.[36] The means of free egress and ingress to his lot is as much property as the lot itself, and is a right, in a legal sense, appurtenant to the lot.[37]

When viewing only the evidence and inferences that tend to support the trial court's finding and disregarding all evidence and inferences to the contrary,[38] we find that there is not more than a scintilla of evidence of probative force to support the finding that Seelbach suffered no special injury and that reasonable minds could not differ in determining that he had suffered a special injury. After Seelbach obtained his one-acre undivided interest in

33. *Schwartz v. Pinnacle Communications,* 944 S.W.2d 427, 432 (Tex.App.-Houston [14th Dist.] 1997, no writ).

34. *Shelton v. Phillips,* 229 S.W. 967, 970 (Tex. Civ.App.-Texarkana 1921, no writ) (emphasis added).

35. 4 S.W.2d 136, 139 (Tex.Civ.App.-Amarillo 1927, writ ref'd) (emphasis added).

36. *Spann v. City of Dallas,* 111 Tex. 350, 235 S.W. 513, 513 (1921).

37. *Phillips,* 229 S.W. at 967.

38. *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992).

the property in April, his right of access to his land was obstructed by the locked eastern and western gates. The evidence is undisputed that Seelbach did not have a key to the eastern gate and that his access to the McCoy tract was obstructed from April 17, 1997 until October of 1997, when the trial court entered the agreed temporary restraining order.[39] Therefore, the trial court erred in finding he suffered no special injury.

After an examination of the entire record, we find that Seelbach established the contrary proposition as a matter of law, i.e., that he suffered special injury as a result of the gates. Seelbach owned property abutting the public right-of-way, the only way to access his property was by using the public right-of-way, and his access to the public right-of-way was blocked. In light of the foregoing authorities, Seelbach had an individual right distinct from that of the public at large to free and convenient passage from and egress to his property, and he suffered a special injury when this right was impaired by the locked gates. Commissioner Moore's letter to the Clubbs indicated that it was illegal to maintain a gate across a county right-of-way, and Justin Clubb testified that although he did not install the gates, he did maintain them. We sustain Seelbach's argument that he conclusively established all vital facts in support of his contention that he suffered a special injury. Because we sustain Seelbach's matter of law point, we need not address his contention that the trial court's finding of no special injury was against the great weight and preponderance of the evidence.

■ However, to recover actual damages, the plaintiff must prove that he suffered an actual pecuniary loss by reason of the defendant's wrong.[40] We turn now to whether the trial court erred in finding Seelbach suffered no actual ˙ damages. Seelbach contends he suffered actual dam-

ages when he lost the use and enjoyment of his one acre because he did not have unobstructed access to his property. The question here is whether he proved actual damages as a result of interference with that right.

Seelbach testified that he incurred several expenses in his attempted purchase of the entire 101–acre McCoy tract. Those include: (1) a survey of the land done by Billy Howell costing approximately $6,300; (2) an environmental survey to detect hazardous wastes on the land costing $600; (3) interest on a loan from the bank totaling $1,514; (4) time off from work; (5) five months' apartment rental from July or August of 1997 until the time of trial in December of 1997; (6) storage fees during the five months he was renting the apartment; and (7) attorney's fees totaling approximately $16,000, excluding trial work.

In *Hall v. Robbins*,[41] the plaintiffs filed suit to enjoin the defendants from interfering with the access to their land. The defendants blocked off a road leading to the plaintiffs' land. The plaintiffs also sought monetary damages to compensate for the time they were denied access to the property that prevented them from developing the property. The evidence of damages the plaintiffs presented related to accrued real estate taxes, accrued interest on the purchase money mortgage, and loans to pay taxes for the time they were excluded from the property.

The court of appeals held that the trial court had correctly classified the injury to the plaintiffs' property as temporary in nature, stating that "temporary injuries to real property are those which are sporadic and contingent upon some irregular force which may be enjoined."[42] The court of appeals stated that "there is no doubt that there was a special injury suffered by the [plaintiffs] when the obstruction interfered

---

**39.** Seelbach was given a key to the property when the trial court entered the agreed temporary restraining order.

**40.** 28 Tex. Jur. 3d *Damages* § 9 (1983).

**41.** 790 S.W.2d 417 (Tex.App.-Houston [14th Dist.] 1990, no writ).

**42.** *Id.* at 418.

with the right of access to their property."[43] The court of appeals further stated that the trial court had correctly determined the value of the loss of use of the property was a proper measure of damages under the circumstances, stating that "the lease value of the vacant land is an appropriate measure of damages for temporary loss of use in these circumstances."[44] Because the plaintiffs in *Robbins* failed to place before the court any evidence of loss of use, such as the rental value of the land, the court of appeals found the trial judge did not err in denying the plaintiffs actual damages as a result of the obstruction.[45]

 The court in *Robbins* explained that the proper measure of recovery for a temporary injury to realty has been calculated in various ways, depending on the circumstances. The court cites several cases, most of them dealing with physical injury to land. In the present case, there was no physical injury to the undeveloped land. The court in *Robbins* found that the lease value of the vacant land was an appropriate measure of damages for temporary loss of use of the land. An appropriate measure of damages for the value of Seelbach's loss of use of the land during the delay would have been the reasonable value or lease value during the delay.

 Seelbach did not show the lease value or rental value of the land. We do not hold that this is the only appropriate damage that can be awarded for temporary loss of use of land, but none of the items Seelbach contends were actual damages were proper measures. Seelbach's argument that he should be reimbursed for the land and environmental survey is not valid because they are not a measure of his temporary loss of use of the land during the delay. Seelbach was not ultimately denied the purchase of the land on

which the surveys were made. Thus, he did not lose the benefit of the surveys. The time Seelbach took off from work was also not a proper measure of his loss of use of the land. We find no case, nor have we been cited any, allowing damages for missing work to attend to legal proceeding as being compensable.

Seelbach testified that he had "already taken out a loan to close on the property" and that he suffered actual damages in the amount $1,515 in interest on a loan for the purchase of the land. He testified that he then discovered there was a problem with the property and he repaid the loan to the financial institution so that he would not incur any more interest on the loan. He did not testify that the money borrowed had to be paid to seller before the closing. Thus, the loan was premature for the purchase of the entire tract of land. The amount of interest was obviously not the amount paid on one acre. This is not a proper measure of the value of his lost use of the land during this time.

After acquiring his undivided one-acre interest, Seelbach testified he incurred an apartment rental fee of $575 and storage unit rental fees of $139 per month for a five-month period prior to trial. There were no apartments or storage facilities on the vacant land, but he testified he was deprived of his right to place them there and use them.

 Seelbach had an obligation to minimize his damages.[46] Seelbach never asked the Clubbs for a key, and he never received a key from the McCoys. Thomas Clubb testified that he offered Seelbach "[a] chance to put a key—lock and key on there [eastern gate] if he would call me when he got there. Every time I meet him, he goes by, he says, 'I can't talk to you. Talk to my lawyer.' " When Seel-

---

43. *Id.*

44. *Id.* at 419 (citing *City of Austin v. Teague,* 570 S.W.2d 389, 394 (Tex.1978)).

45. *Id.*

46. *Robbins,* 790 S.W.2d at 419 (citing *Chapman v. Southern Hospitalities, Inc.,* 624 S.W.2d 320, 323 (Tex.App.-Tyler 1981, no writ); *Tackett v. Mid–Continent Refrigerator Co.,* 579 S.W.2d 545, 548 (Tex.Civ.App.-Fort Worth 1979, writ ref'd n.r.e.)).

bach was asked why he did not ask the Clubbs for a key, the following exchange took place:

A. Since they were being obstinate about the removal of the fence, I did not figure they would have given me one. If they wanted me to have a key, I felt that they would have sent me one.

Q. But you did not ask them for one?

A. They have been sent a demand letter with my address.

Q. Excuse me. What was your last response?

A. They had been sent a demand letter with my address. They could have mailed me a key..

Q. But did you ask them for one? Just yes or no.

A. No.

The damages for loss of use of an unbuilt house or apartment and storage unit for this temporary time is speculative. It was for the fact finder to determine if Seelbach was denied the right to construct or secure these proposed buildings and whether or not there was a loss. We find that the trial court did not err in failing to find that Seelbach suffered no monetary damages based upon the evidence. As discussed elsewhere in the opinion, there was special damages to the extent that Seelbach was entitled to an injunction, but this does not show entitlement to monetary damages.

In a separate point of error, Seelbach challenges the trial court's award of attorney's fees; therefore, we will not address attorney's fees here.

After reviewing the record, we also will evaluate other possible sources of special injury that Seelbach contends led to actual damages. Seelbach testified that the fence along the northern boundary of the southern Clubb tract abutting the right-of-way and the rice levee, and the drainage ditch abutting the right-of-way on Justin's tract north of the right-of-way did not interfere with his access. Therefore, he did not suffer any special injury as a result of these structures, and we do not reach the question of whether he suffered actual damages as a result of them.

Seelbach testified that he incurred no actual damages from the trespass of the Clubbs' cattle onto his land and onto the public right-of-way. Although both Justin Clubb and Thomas Clubb admitted that their cows were in the right-of-way, there was no evidence the cows obstructed Seelbach's access to his property after he purchased his acre. Therefore, he did not suffer any special injury as a result of the cattle, and we do not reach the question of whether he suffered actual damages as a result of them.

The southeastern corner of the McCoy tract is lower in elevation than Justin's tract of land to the north of the public right-of-way. When the Clubbs drain water from their rice farming operations, the water runs off Justin's tract in a southwesterly direction toward the McCoy tract. There was no evidence that the Clubbs released any water from their rice farming operations onto the McCoy tract after Seelbach purchased his one acre or at any time after he signed the earnest money contract. Therefore, he has not shown that he suffered any special injury as a result of the rice farming operations, and we do not reach the question of whether he suffered actual damages as a result of them.

When viewing the evidence in the light most favorable to the trial court's ruling, there is some evidence of probative value to support the trial court's finding that Seelbach did not suffer any actual damages as a result of the Clubbs' obstructions. Further, after examining all of the evidence, the trial court's finding on actual damages was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. The trial court's granting of the permanent injunction in Seelbach's favor cured the special injury Seelbach suffered as a result of the gates. This point of error is overruled.

 In his second point of error, Seelbach contends the trial court erred in denying his motion to modify the judgment.

Seelbach includes this point of error in the table of contents of his brief, but the brief itself does not contain a separate point of error containing any argument or authorities in support of this point of error. Because Seelbach has not complied with Rule 38.1(h) of the Texas Rules of Appellate Procedure, he has waived this point of error and we will not address it.[47]

In his third point of error, Seelbach contends the trial court erred in its conclusions of law by finding that Seelbach was not entitled to actual damages, punitive damages, attorney's fees, or court costs from the Clubbs. Alternatively, Seelbach contends the trial court's conclusions of law as to punitive damages and attorney's fees were against the great weight and preponderance of the evidence.

The trial court's conclusions of law are always reviewable.[48] Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence.[49] Incorrect conclusions of law will not require reversal, however, if the controlling findings of fact will support a correct legal theory.[50] Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law.[51]

Next, we will address Seelbach's argument that the trial court erred in failing to award him punitive damages. Under Texas law, exemplary damages are not recoverable absent an award of actual damages or equitable relief.[52] Because the trial court correctly granted the permanent injunction and because an injunction is an equitable remedy, we will address

this contention. Specifically, Seelbach contends that the Clubbs' refusal to remove the gates after receiving Commissioner Moore's letter telling them that the eastern gate was not legal and that the gate needed to be removed shows actual malice. Seelbach also points us to several instances in the record where the McCoys and the Clubbs had disagreements over the gates. Seelbach contends these instances show the Clubbs acted with malice. These instances have nothing to do with Seelbach's dealings with the Clubbs and, therefore, are not appropriate for our consideration here. Seelbach also contends the Clubbs' failure to remove the gates after the trial court's judgment shows the Clubbs acted with malice. This is not a proper matter for our consideration in reviewing the trial court's judgment.

Section 41.003(a) of the Texas Civil Practice and Remedies Code provides that exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from fraud, malice, or a willful act or omission.[53] Malice is defined as a specific intent by the defendant to cause substantial injury to the claimant; or an act or omission which, when viewed objectively from the standpoint of the actor at the time of its occurrence, involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indiffer-

---

47. TEX.R.APP P. 38.1(h); *see also Emery v. Rollins,* 880 S.W.2d 237, 238–39 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

48. *Middleton v. Kawasaki Steel Corp.,* 687 S.W.2d 42, 44 (Tex.App.-Houston [14th Dist.] 1985), *writ ref'd n.r.e. per curiam,* 699 S.W.2d 199 (Tex.1985).

49. *Simpson v. Simpson,* 727 S.W.2d 662, 664 (Tex.App.-Dallas 1987, no writ).

50. *Valencia v. Garza,* 765 S.W.2d 893, 898 (Tex.App.-San Antonio 1989, no writ).

51. *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.), *overr. on other grounds, Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890, 894 (Tex.1991).

52. *Goodman v. Page,* 984 S.W.2d 299, 307 (Tex.App.-Fort Worth 1998, no pet. h.) (citing *Nabours v. Longview Sav. and Loan Ass'n,* 700 S.W.2d 901, 904 (Tex.1985)).

53. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a) (Vernon 1997).

ence to the rights, safety, or welfare of others.[54]

After the Clubbs received the letter from Commissioner Moore, the Clubbs' attorney sent a letter to him requesting to work out an agreement with the county. The Clubbs used the gates and fences to keep their cattle on their property. Additionally, the Clubbs never received an order from a court of law or the commissioners court to remove the gate prior to the filing of the suit. Commissioner Moore testified that before he could require removal of the gate in a public right-of-way, the removal would have to be approved by the Jefferson County Commissioners Court. The Clubbs presented evidence that they did not erect the gates, but merely maintained them, and Seelbach did not present any evidence that the Clubbs were consciously indifferent to any extreme degree of risk to his rights. The foregoing does not show malice on the Clubbs' part.

Seelbach argues punitive damages are proper in this case as they were in *Gerstner v. Wilhelm.*[55] In *Gerstner,* the court upheld punitive damages upon a finding that the defendant "root plowed" an easement, making passage difficult; plowed certain portions of his land so as to cause excessive drainage over a part of the easement, making passage difficult in wet weather and; in addition, actually threatened to shoot the plaintiff with a shotgun due to the easement controversy.[56] *Gerstner* is distinguishable from the present case because the Clubbs did not take any overt acts to prevent Seelbach from entering his land, such as plowing up the right-of-way, nor did they threaten Seelbach with bodily injury if he continued to use the right-of-way. They simply maintained the status quo.

Seelbach directs our attention to three criminal cases[57] decided under Article 784 of the 1925 Texas Penal Code contending that they are instructive on the issue of malice. These cases were decided under a now repealed criminal statute, and we do not find them determinative on the issue of an award for punitive damages in a civil case on the issue of malice.

Seelbach has not proven as a matter of law that he was entitled to punitive damages, nor has he shown that the trial court's finding that he was not entitled to punitive damages was against the great weight and preponderance of the evidence.

■ Seelbach also contends the law entitles him to recover his attorney's fees because attorney's fees may be recovered as part of punitive damages involving a malicious wrong. The appellate courts have uniformly held that any award of attorney's fees, pursuant to statute or common law, is within the discretion of the trial judge, and absent a showing of abuse of discretion by the trial judge, a judgment will not be reversed.[58] To determine whether a trial court abused its discretion, we must decide "whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable."[59] An award of attorney's fees must be based on some statutory or contractual authority.[60] Seelbach's case is not based upon a breach of contract; therefore, he is not entitled to any recovery under a contract.[61] Seelbach argues that because the

---

**54.** Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7) (Vernon 1997).

**55.** 584 S.W.2d 955, 957 (Tex.Civ.App.-Austin 1979, writ dism'd).

**56.** *Id.*

**57.** *Hill v. State,* 106 Tex.Crim. 255, 291 S.W. 914 (1925); *Brown v. State,* 73 Tex.Crim. 571, 166 S.W. 508 (1914); *Hatfield v. State,* 67 S.W. 110 (Tex.Crim.App.1902).

**58.** *Simms v. Lakewood Village Property Owners Assoc., Inc.,* 895 S.W.2d 779, 787 (Tex. App.-Corpus Christi 1995, no writ) (citing *Fowler v. Stone,* 600 S.W.2d 351, 353 (Tex. Civ.App.-Houston [14th Dist.] 1980, no writ)).

**59.** *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990).

**60.** *Southern Concrete Co. v. Metrotec Fin., Inc.,* 775 S.W.2d 446, 449 (Tex.App.-Dallas 1989, no writ).

**61.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon 1997).

record contains evidence of his attorney's fees and the amount and reasonableness thereof, they should have been considered as part of the punitive damages and awarded in his favor. Seelbach's argument fails, however, because we have found that Seelbach was not entitled to punitive damages. For this reason, we need not address Seelbach's argument that the trial court's finding that he was not entitled to attorney's fees was against the great weight and preponderance of the evidence.

■■■■■ Next, Seelbach contends the trial court erred in finding he was not entitled to recover court costs, because he was the successful party to the lawsuit and because there was no good cause stated on the record supporting the trial court's determination. The Texas Rules of Civil Procedure provides that "the successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided."[62] However, the court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules.[63] The decision to assess costs is within the trial court's discretion. Absent an abuse of discretion, we will not reverse the trial court's assessment of costs.[64] Seelbach contends he was the successful party because the trial court granted him a permanent injunction and thus, was not obligated to pay court costs.

First, Seelbach was not wholly successful on his claims; although the court granted him a permanent injunction, it also found that he was not entitled to recover actual or punitive damages, which we have upheld on appeal. Thus, he cannot rely on Rule 131, because Clube prevailed on the damage award portion of the

case. The trial court did not abuse its discretion in determining that Seelbach was not entitled to recover court costs. This point of error is overruled.

■■■ In his final point of error, Seelbach contends amended finding of fact number 20, regarding the legal description of the southern Clubb tract (the 143–acre tract south of the right-of-way), was contrary to the evidence as a matter of law. Seelbach brings this point of error because he "anticipates that the Clubbs' [sic] will attempt to argue that the county right-of-way actually belongs to them and that the [right-of-way] is improperly located." The Clubbs did not make such an argument at trial or in their brief to this Court. Nevertheless, we will examine whether the trial court's finding of fact was contrary to the evidence as a matter of law. Seelbach is only challenging the legal sufficiency of this finding of fact. Therefore, we will only review the evidence and inferences tending to support the trial court's finding, and we will disregard all evidence and inferences to the contrary. Seelbach contends that the survey presented by his expert witness, Billy Howell, was the proper legal description of the property.

■■■■ The law in Texas is clear that in locating disputed boundary lines, priority must be given to the calls of the original grant, which are more specific and definite in preference to those merely general and indefinite.[65] In *Stafford v. King*,[66] the court discussed the proper manner by which to establish boundaries in a patent. When a patent is issued, the surveyor is to "run round the land located and intended to be embraced by the survey and patent, and see that such objects are designated on it as will clearly point out and identify

---

**62.** Tex.R. Civ. P. 131.

**63.** Tex.R. Civ. P. 141.

**64.** *See Hasty, Inc. v. Inwood Buckhorn Joint Venture*, 908 S.W.2d 494, 502 (Tex.App.-Dallas 1995, writ denied).

**65.** *Greenwood*, 915 S.W.2d at 591 (citing *Stafford v. King*, 30 Tex. 257 (1867); *Taylor v. Higgins Oil & Fuel Co.*, 2 S.W.2d 288, 300 (Tex.Civ.App.-Beaumont 1928, writ dismissed w.o.j.)).

**66.** 30 Tex. 257 (1867).

the locality and boundaries of the tract...."[67] The surveyor is to take field notes on the land, which should include natural and artificial objects, if any, and courses and distances.[68] Often, however, the objects or "calls" referenced in the field notes will disappear over time. Therefore, the law has created a priority, referred to as the dignity of calls, when trying to re-establish the boundary in a later transfer of title.[69] The law of legal preferences gives dignity to calls in the following order: (1) natural objects; (2) artificial objects; (3) course; and (4) distance.[70]

The trial court found the survey done by John Henry, Jr. contained the proper legal description. Henry surveyed the Clubb tract of land south of the public right-of-way prior to the Clubbs' purchase of the southern Clubb tract in 1994. Henry was a registered professional land surveyor and had obtained his registration in 1974. Rather than letting a survey crew do the work, Henry did the survey himself by walking the land. Henry testified that he used the oldest survey he could find, a 1908 survey by a Mr. Woldert, and that his job as a surveyor was to try and follow in the footsteps of the original surveyor. The Woldert survey indicated that a fifteen-inch white oak tree was the southwest corner of the survey. Henry found a twenty-four-inch white oak tree at the corner of the old fence line. He testified that with the tree in mind, he placed the Woldert survey on the ground and went south. He found a one-and-a-half-inch pipe in concrete. Henry testified that at one time he had used the pipe in the concrete as the northwest corner of the McFarland survey (southwest corner of the Lawhon survey and the southwest corner of the McCoy tract according to the Woldert survey). Henry testified that based on the Woldert

survey, the one-and-a-half-inch pipe was not the northwest corner of the McFarland survey and that he needed to go another 59.7 feet before he would reach the southwest corner of the Lawhon survey, which Woldert had found according to his call. Henry testified that his survey ended up being within two-to-three feet of the old fence line, so he was satisfied he was on the Woldert survey.

Seelbach contends that Henry should have used the one-and-a-half-inch pipe as the southwest corner of the Lawhon league because the Henry survey rested on the dubious assumption that the white oak tree Henry found was the same white oak tree identified in the Woldert survey. Seelbach directs this Court's attention to *Browning's Administratrix v. Atkinson,*[71] wherein, he argues, the court held that a call for a natural object over a call for an artificial object controls only where the object can be found and identified on the ground with reasonable certainty. He testified that he was convinced the twenty-four-inch oak tree was the same oak tree that Woldert indicated as the southwest corner of the Lawhon survey, because he found wire embedded in the oak tree and he noticed the same thing along the other fence lines.

Billy Howell testified that he determined the southwest corner of the Lawhon survey was the one-and-a-half-inch pipe set in concrete. However, Howell testified that he was not part of the survey crew that did the actual survey that was admitted into evidence as the Howell evidence. Howell testified that you have to be a registered professional land surveyor to do land survey work and that the chief of his survey party was not a registered surveyor. Because Henry did the survey himself and because he used a natural object as

---

67. *Greenwood,* 915 S.W.2d at 591 (citing *Stafford,* 30 Tex. at 269–70).

68. *Id.*

69. *Greenwood,* 915 S.W.2d at 591 (citing *Stafford,* 30 Tex. at 271).

70. *Greenwood,* 915 S.W.2d at 591 (citing *Stafford,* 30 Tex. at 271; *City of Carrollton v. Duncan,* 742 S.W.2d 70, 72 (Tex.App.-Fort Worth 1987, no writ)).

71. 37 Tex. 633 (1872).

the southwest corner of the Lawhon survey, we find there is some probative evidence that supports the trial court's finding that the Henry survey was the proper legal description of the southern Clubb tract. This point of error is overruled.

The judgment is affirmed.