COURT OF APPEALS

















COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL PASO, TEXAS

 

GUITAR HOLDING COMPANY,
L.P.,              )

                                                                              )

Appellant/Cross-Appellee,                         )              
No.  08-05-00115-CV

                                                                              )

v.                                                                           )                    Appeal from the

                                                                              )

HUDSPETH COUNTY
UNDERGROUND         )                
205th District Court

WATER CONSERVATION DISTRICT
NO. 1,  )

by and through its Board of
Directors, et al.,           )          
of Hudspeth County, Texas

                                                                              )

Appellees/Cross-Appellants.                      )                   (TC#
3790-205)

                                                                              )

 

 

O
P I N I O N

 








This appeal arises
from the implementation of groundwater regulations by Appellee Hudspeth County
Underground Water Conservation District No. 1 (Athe
District@) under
its purported statutory authority under Chapter 36 of the Texas Water
Code.  On appeal, Appellant Guitar
Holding Company, L.P. (AGuitar
L.P.@)
contends the District exceeded its statutory authority under Chapter 36 when it
adopted new rules for transfer permits that discriminate against
similarly-situated landowners and rules for production permits that limit
production based on a specific historic use period.  Guitar L.P. also complains that the District=s new transfer rules violate its equal
protection rights under the United
 States and Texas Constitutions.  In addition, Guitar L.P. claims that the
District violated its vested rights by considering its permit applications
under the new rules, rather than the old rules that were in effect when Guitar
L.P. initially filed its applications, an action that it asserts is contrary to
the Vested Rights Statute in Section 245.002 of the Texas Local Government Code.
 In a limited cross-appeal, the District
challenges the trial court=s
denial of its attorney and expert fees, as well as the costs incurred in
preparing the administrative record, and the court=s
ruling in favor of Guitar L.P. on Guitar L.P.=s
claim for a refund of administrative fees. 
The District also argues that the trial court erred in apportioning
partial court costs against the District. 
We affirm in part, and reverse and remand in part.

FACTUAL
AND PROCEDURAL BACKGROUND

The Bone Spring-Victorio
Peak Aquifer (the ABS-VP
Aquifer@ or Athe Aquifer@)
produces groundwater for a region in west Texas
commonly referred to as the Dell Valley located in northeast Hudspeth County.  Prior to 1947, the Dell Valley
area was primarily the site of cattle ranching. 
However, in the years that followed, an intense irrigated agricultural
industry developed in the region, which led to a marked increase in the use of
its groundwater for irrigation purposes. 
In the mid-1950s, the Hudspeth
 County Commissioners Court
, by a petition followed
by a confirmation election, created the District to conserve and protect the
BS-VP Aquifer.  Irrigation pumpage in the
Dell Valley area peaked in the late 1970s,
during which time pumpage exceeded recharge, resulting in a decline in the
water table elevation for the BS-VP Aquifer. 
During the 1980s, irrigation pumpage diminished somewhat and water
levels remained relatively constant, however, by the mid-1990s, water levels
once again faced a downward trend.  








In 1990, the
District enacted Rules (Athe
1990 Rules@ or Aold Rules@),
which established a permitting system for drilling, equipping, or altering the
size of a well and a certification process for validating existing wells within
the district.  Under the 1990 Rules, the
allowable rate for each water well within the district was limited to five
acre-feet of water per year, regardless of the proposed use of the water.  However, the 1990 Rules placed stringent restrictions
on the transport of groundwater for use outside the district.  In 1998, the Board of the District adopted
its groundwater management plan pursuant to Chapter 36 of the Texas Water Code.  The State Auditor=s
Office audited the District=s
implementation of its certified groundwater management plan in 2000 and
determined that the District had failed to meet its plan objectives and thus,
was Anot
operational@ and in
violation of the provisions of the Code.

By March 2002, the
District had developed a new management plan, which was later certified by the
Texas Water Development Board.  According
to the 2002 management plan, the best available information suggests that
63,000 acre-feet per year is the long-term average amount of groundwater
available for consumptive use or transfer from the District from the BS-VP
Aquifer.  Effective May 31, 2002, the
District repealed its 1990 Rules and adopted new rules (the A2002 Rules@)
regarding groundwater regulation within the district, which are now the subject
of this appeal.

Guitar L.P.=s history in the region began in 1924
when John Guitar, Sr. purchased over 52,000 acres of land in the Dell Valley.  Between the 1940s and 1960s, many parts of
the Guitar family=s land
was irrigated, but since that time period, the land has been used primarily for
cattle ranching.  In 2002, Guitar L.P.
was formed to manage the property, which today consists of approximately 38,296
acres, situated within the boundaries of the district.  There are fifteen existing groundwater wells
on the property, nine of which Guitar L.P. asserts have been used for
irrigation purposes.








On May 14, 2002,
Guitar L.P. filed an application for validation certificates for the fifteen
existing wells, an application for fifty-two new water well drilling permits,[1]
and an application for a permit to transfer water.  Despite Guitar L.P.=s
requests, the District processed its validation and transport permits under the
2002 Rules, not the 1990 Rules.  After an
evidentiary hearing, the District issued validation and transport permits to
Guitar L.P., which, based on the production limits established under the 2002
Rules that inter alia designate an existing and historic use period,
resulted in issuance of a validation permit for 57.96 irrigated acres, authorizing
annual production of between 174 and 232 acre-feet of water depending on the
level of the BS-VP Aquifer.  The District
also issued a transport permit authorizing Guitar L.P. to transport its water
held under the validation permit out of the district.  Cimarron Agricultural Ltd. (ACimarron@),
CL Machinery Company (ACLM@), the Rascoes, Robert L. Carpenter,
Gail Carpenter, and Triple B. Farms had also applied for validation and
transport permits, however, their permitted amounts of water production and its
subsequent transport were significantly greater than Guitar L.P.=s permits despite Guitar L.P.=s much larger property holdings within
the District.  This was due to the
parties prior use of groundwater during the designated existing and historic
use period under the 2002 Rules.








In four separate
administrative appeals to the 205th Judicial District Court of Hudspeth County,
Guitar L.P. challenged the facial validity of the District=s adoption of new rules regarding
production and transfer permits, raised an as-applied challenge to the validity
of groundwater permits the District issued to inter alia Cimarron and
CLM, and appealed the District=s
adverse actions on its own permit applications.  [Guitar I, Guitar II, and Guitar
III].  In the fourth administrative
appeal, Guitar L.P. also raised an as-applied challenge to the validity of the
groundwater permits issued to Robert L. Carpenter, Gail Carpenter, and Triple
B. Farms and challenged the validity of the new rules.  [Guitar IV].

In the trial court=s final judgment entered on October 15,
2004, in the first three suits, consolidated under trial cause number 3703-205,
the court upheld the validity of the District=s
new rules, the validity of the permits to Cimarron and CLM, and application of
the new rules to Guitar L.P.=s
permit applications.  However, with
regard to Guitar L.P.=s
permit applications, the court held in favor of Guitar L.P. on its claim for a
$9,399.34 refund of administrative fees in connection with administrative
proceedings before the District=s
board and denied attorney and expert fees in Guitar I-III.  On March 11, 2005 under trial cause number
3790-205, the trial court rendered a final judgment in Guitar IV, which
upheld the validity of the District=s
new rules as well as the groundwater permits issued to the Carpenters and
Triple B. Farms, but denied attorney fees to any of the parties.

STATUTORY
AUTHORITY

In Issues One and
Three, Guitar L.P. challenges the validity of the District=s 2002 Rules regarding transfer permit
applications and production-based limitations for validation and operating
permits, arguing that the District exceeded its statutory authority under
Chapter 36 of the Texas Water Code.








Article 16,
section 59 of the Texas Constitution imposes on the Legislature the duty to
protect our state=s natural
resources.  Tex.Const. art. XVI, '
59(a).  Pursuant to Section 59(b),
the Legislature has the authority to create conservation districts to
accomplish Athe
purposes of this amendment to the constitution, which districts shall be
governmental agencies and bodies politic and corporate with such powers of
government and with the authority to exercise such rights, privileges and
functions concerning the subject matter of this amendment as may be conferred
by law.@  Tex.Const.
art. XVI, '
59(b).  Consistent with the objectives of
Article 16, section 59, the Legislature has adopted Chapter 36 of the Texas
Water Code A[i]n
order to provide for the conservation, preservation, protection, recharging,
and prevention of waste of groundwater, and of groundwater reservoirs or their
subdivisions, and to control subsidence caused by withdrawal of water from
those groundwater reservoirs or their subdivisions . . . .@ 
Tex.Water Code Ann. ' 36.0015 (Vernon Supp. 2006).  Thus, the Legislature has declared
groundwater conservation districts to be Athe
state=s
preferred method of groundwater management through rules developed, adopted,
and promulgated by a district in accordance with the provisions of this
chapter.@  Id.








Groundwater
conservation districts are political subdivisions of the state.  See Tex.Water
Code Ann. '
36.001(15); see also Bennett v. Brown County Water Improvement Dist. No. 1,
272 S.W.2d 498, 500 (Tex.
1954).  As such, groundwater conservation
districts have only such powers as are expressly granted by the statute and
those powers that are necessarily implied in order to carry out the express
powers given.  See Harris
 County Water
Control and Imp. Dist. No. 58 v. City of Houston, 357 S.W.2d 789, 795
(Tex.Civ.App.--Houston 1962, writ ref=d
n.r.e.), citing Tri‑City Fresh Water Supply District No. 2 of
Harris County v. Mann, 135 Tex. 280, 284, 142 S.W.2d 945, 947
(1940)(holding that the district had no authority to issue bonds and levy taxes
for fire protection equipment or a sewerage system where no such powers were
expressly delegated to the district by the statute and such functions could not
be implied from the powers expressly conferred in the statute); see also In
re Entergy Corp., 142 S.W.3d 316, 322 (Tex. 2004); Subaru of America,
Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 220 (Tex. 2002).

Standard
of Review








In order to
determine whether the District has exceeded its statutory authority under
Chapter 36, we must construe the relevant statutory provisions contained within
the chapter. Statutory construction is a question of law subject to de novo review.  See Bragg v. Edwards Aquifer Auth., 71
S.W.3d 729, 734 (Tex. 2002); Johnson v.
City of Fort Worth, 774 S.W.2d 653, 656 (Tex. 1989).  In construing a statute, our primary
objective is to ascertain and give effect to the Legislature=s intent.  See In re Entergy Corp., 142 S.W.3d at
322; Tex. Dep=t of Transp. v. Needham,
82 S.W.3d 314, 318 (Tex.
2002).  We look first to the statute=s plain and common meaning; if the
statutory language is unambiguous, we will interpret the statute according to
its plain meaning.  In re Entergy
Corp., 142 S.W.3d at 322.  However,
if the statute is ambiguous, we then consider other matters to ascertain the
Legislature=s intent,
including the objective of the law, the legislative history, and the
consequences of a particular construction. 
See Tex.Gov=t Code Ann. '
311.023 (Vernon 2005); McIntyre v. Ramirez, 109 S.W.3d 741, 745 (Tex. 2003).  The reviewing court Awill
not give an undefined statutory term a meaning that is out of harmony or
inconsistent with other provisions in the statute.@  McIntyre, 109 S.W.3d at 745.  Since questions of statutory interpretation
are questions of law, we are not bound by an agency=s
construction of a statute and no presumption of validity attaches to it.  See Entex, a Div. Of Reliant Energy
Resources Corp. v. Railroad Comm=n
of Texas,
18 S.W.3d 858, 862 (Tex.App.--Austin 2000, pet. denied).  Further, an agency=s
interpretation is entitled to serious consideration, only if the agency=s construction of its statute is
reasonable and does not contradict the statute=s
plain language.  See Railroad Comm=n of Texas, 18 S.W.3d at 862; see also
Continental Cas. Co. v. Downs, 81 S.W.3d 803, 807 (Tex. 2002).

GROUNDWATER
REGULATION STATUTORY PROVISIONS

The Legislature
has expressly granted certain rule-making powers to groundwater districts.  In accordance with Section 36.101(a) of the
Water Code:

A district may
make and enforce rules, including rules limiting groundwater production based
on tract size or the spacing of wells, to provide for conserving, preserving,
protecting, and recharging of the groundwater or of a groundwater reservoir or
its subdivisions in order to control subsidence, prevent degradation of water
quality, or prevent waste of groundwater and to carry out the powers and duties
provided by this chapter.[2]

 

Tex.Water Code Ann.
' 36.101(a).

 

A district is
required to consider all groundwater uses and needs during the rule-making
process and must develop rules which are fair and impartial.  See Tex.Water
Code Ann. ' 36.101(a).








Further, the
Legislature has mandated that groundwater districts implement a permitting
system Afor the
drilling, equipping, operating, or completing of wells or for substantially
altering the size of wells or well pumps.@[3]  Tex.Water
Code Ann. ' 36.113(a).  Section 36.116 provides a district with
statutory authority to regulate by rule the production of groundwater by:
setting production limits on wells; limiting the amount of water produced based
on acreage or tract size; limiting the amount of water that may be produced
from a defined number of acres assigned to an authorized well site; limiting
the maximum amount of water that may be produced on the basis of acre-feet per
acre or gallons per minute per well site per acre; or any combination of the methods
listed above . . . .[4]  Tex.Water
Code Ann. '
36.116(a)(2)(A)-(D), (F).  In addition,
the statute formerly provided that:  A[i]n promulgating any rules limiting
groundwater production, the district may preserve historic use before the
effective date of the rules to the maximum extent practicable consistent with
the district=s
comprehensive management plan under Section 36.1071.@[5]  Acts of 2001, 77th Leg., R.S., ch. 966, ' 2.50, 2001 Tex.Gen.Laws 1991, 2015-16 [hereinafter ATex.Water
Code Ann. ' 36.116(b)(2001)@]. 









Before determining
whether to grant or deny a permit, the district must consider inter alia:  whether the proposed use of water
unreasonably affects existing groundwater and surface water resources or
existing permit holders; whether the proposed use of water is dedicated to any
beneficial use; and whether the proposed use of water is consistent with the
district=s
certified water management plan.  Tex.Water Code Ann. ' 36.113(d).  Further, the statute formerly provided that
when granting a permit, the district may impose more restrictive permit
conditions on new permit applications and increased use by historic users if
the limitations:

(1)        apply to all subsequent new permit
applications and increased use by historic users, regardless of type or
location of use;

 

(2)        bear a reasonable relationship to the
existing district management plan; and 

 

(3)        are reasonably necessary to protect
existing use.[6]  

 

Acts of 2001, 77th Leg., R.S., ch.
966, ' 2.49,
2001 Tex.Gen.Laws 1991, 2015
[hereinafter ATex.Water Code Ann. ' 36.113(e)(2001)@].

If a permit
application or a permit amendment proposes the transfer of groundwater outside
of a district=s
boundaries, the district may promulgate rules requiring a person to obtain a
permit or permit amendment under Section 36.113 for the transfer of groundwater
out of the district.  See Tex.Water Code Ann. ' 36.122(a), (b).  Except as provided in Section 36.113(e), the
district may not impose more restrictive permit conditions on transporters than
the district imposes on existing in-district users.  Tex.Water
Code Ann. '
36.122(c).  When reviewing a proposed
transfer of groundwater out of the district, subsection (f) of Section 36.122
requires a district to consider:

(1)        the availability of water in the
district and in the proposed receiving area during the period for which the
water supply is requested;

 

(2)        the projected effect of the proposed
transfer on aquifer conditions, depletion, subsidence, or effects on existing
permit holders or other groundwater users within the district; and

 

(3)        the approved regional water plan and
certified district management plan.

 








Tex.Water Code Ann.
' 36.122(f).

 

Under the statute,
a district cannot adopt rules expressly prohibiting the export of groundwater,
but it may limit a permit issued under Section 36.122 if the conditions in
subsection (f) warrant the limitation, subject to Section 36.122(c).  See Tex.Water
Code Ann. ' 36.122(f),
(g), and (o).  Further, in applying
Section 36.122, a district Amust
be fair, impartial, and nondiscriminatory.@  Tex.Water
Code Ann. '
36.122(q).

DISTRICT
RULES

Under its 2002
Rules, the District requires an operating permit or validation permit to
withdraw or produce water from a non-exempt well or for the substantial
altering of the size or capacity of a non-exempt well.  District
Loc. Rule 6.1(a).  Operating
permits are granted based upon surface acreage owned or controlled by an
applicant and are available to those who have no validation permit covering the
same acreage.  District Loc. Rules 6.10, 6.11.  In granting or denying such permits, the
District considers factors which are consistent with those outlined in Section
36.113(d).  District Loc. Rule 6.11. 
Under the Rules, operating permit holders are entitled to withdraw up to
4.0 acre-feet of water per acre based on the degree to which the Aquifer=s average water elevation is greater
than 3,580 feet.  District Loc. Rule 3.5(c)(2). 
Operating Permits are entitled to no water allocation if the Aquifer
level is 3,580 feet or less.  District Loc. Rule 3.5(c)(2).








In contrast,
validation permits take into account existing and historic use of groundwater
in the district.  District Loc. Rule 6.12(a). 
Existing and historic use for irrigation purposes is based on the amount
of acres irrigated during the existing and historic use period, which the
District has defined as the period running from January 1, 1992 to May 31,
2002, and the average water elevation of the BS-VP Aquifer.[7]  District
Loc. Rules 1.1, 6.12(f), 6.12(h)(1). 
For all other non-exempt uses, the existing and historic use of
groundwater is determined by the maximum amount of water beneficially used in
any one calendar year during the existing and historic use period.  District
Loc. Rule 6.12(h)(2).  Validation
permit holders are entitled to 4.0 acre-feet of water per acres of existing and
historic irrigated land for in-district irrigation if the Aquifer level is
greater than 3,570 feet.  District Loc. Rule 3.5(c)(1).  In the event the average water elevation is
less than 3,560 feet, the District by resolution can establish a 3.00 acre-feet
per acre per year water allocation for all validation permits of existing and
historic use.  District Loc. Rule 3.5(4)(A). 
When the average water elevation is less than 3,570 feet, the water
allocation for uses other than irrigation, is a pro-rata reduction of the
amount recognized in validation permits of existing and historic use.  District
Loc. Rule 3.5(4)(B).








The District
requires a transfer permit in order to transfer any groundwater produced or
withdrawn within the district, and such permits are only available to
applicants who hold either validation permits or operating permits.[8]  District
Loc. Rule 6.13(j).  The water
allocation for transfer permits is linked to the amount allocated under the
underlying validation or operating permits. 
District Loc. Rule
3.7.  Transfer permit water allocation is
one hundred percent of the amount specified in the underlying permit if issued
for non-exempt uses other than irrigation. 
District Loc. Rule
3.7(2).  Otherwise, the water allocation
for a transfer permit is subject to a leaching fraction (the amount of water
that percolates back to the BS-VP Aquifer) reduction equal to 0.30 of the
volume of irrigation water applied to the land. 
District Loc. Rules 3.7,
1.1

ISSUES
ON APPEAL

On appeal, Guitar
L.P. attacks the District=s
2002 Rules regarding water allocation for transfer permits, which none of the
parties dispute is integrally linked to the allowable groundwater production
the District permits under a landowner=s
underlying validation or operating permit. 
First, Guitar L.P. asserts that the District=s
transfer rules are impermissible under Section 36.113(e) because the linkage of
a landowner=s
allocation of groundwater for transfer purposes to the amount of water that is
allocated under a validation or operating permit imposes Amore restrict permit conditions@ on holders of operating permits and
non-Aexisting
and historic irrigated land@
(AEHIL@)
validation permits who wish to transfer water outside the district.  Relatedly, Guitar L.P. also challenges the
District=s
statutory authority to implement the production limitations that form the basis
of the underlying permitting system, which undisputedly favor prior use of
groundwater for irrigation purposes based on the ten and one-half year period
designated by the District.  We will
address this latter issue first.








As we stated
above, Section 36.116 authorizes the District to regulate the production of
groundwater, enumerating a number of acceptable methods for production-based
limitations.  See Tex.Water Code Ann. ' 36.116(a)(2)(A)-(D) & (F).  Guitar L.P. contends that none of the
provisions allow a district to impose production limits based upon existing and
historic use during a specific period. 
However, we believe that it is clear that the District=s regulatory scheme for production
limits is based on a combination of the methods listed in the statute, namely,
setting production limits on wells, limiting the amount of water based on
acreage, and limiting the maximum amount of water that may be produced on the
basis of acre feet per acre.  See Tex.Water Code Ann. ' 36.116(a)(2)(A)-(D) & (F).  The District=s
authority to designate an existing and historic use period in order to protect
historic use within its permitting scheme firmly rests in Section
36.116(b).  We find that the plain
language of Section 36.116(b) permits the District to preserve historic use in
promulgating any rules limiting groundwater production to the maximum
extent practicable consistent with the district=s
management plan.[9]  See Tex.Water
Code Ann. '
36.116(b)(2001).  Therefore, the District
has not exceeded its statutory authority to regulate groundwater production by
establishing a permitting system that protects historic use of groundwater by
allocating production limitations based on a landowner=s
groundwater use during a historic use period that pre-dates the effective date
of the District=s rules.








Guitar L.P.,
however, also challenges the District=s
authority to designate a specific historic use period under Section
36.116(b).  Specifically, Guitar argues
that the District=s Ageneral@
authority to preserve historic irrigation does not constitute clear authority
for the District to set production limits that preserve only irrigation use which
occurred during a ten and one-half year historic period.  We agree, of course, that the statute does
not create a specific period for which a district Amay
preserve historic or existing use before the effective date of the rules . . .,@ however, such a mandate would most
certainly be untenable given the diverse needs that must be addressed by
groundwater resources management among the State=s
local districts.  See Tex.Water Code Ann. ' 36.116(b)(2001); Tex.Water Code Ann. ' 36.0015, '
36.101(a),  ' 37.1071(a);
see also Railroad Comm=n
of Texas v. Lone Star Gas Co., 844 S.W.2d 679, 687 (Tex. 1992)(by
conferring upon an agency the power to promulgate rules and regulations
necessary to carry out the purposes of an act, the Legislature forecloses the
argument that it intended to spell out the details of regulating the
industry).  The Legislature has provided
local groundwater districts with the flexibility to designate a historic use
period, in relation to its management plan, and, by necessity, impliedly
authorized the District to define what constitutes the Ahistoric
use@ to be protected.[10]








Tangentially,
Guitar L.P. also asserts that the historic use period adopted by the District
fails to preserve historic use Ato
the maximum extent practicable@
given the region=s history
of irrigation which dates back to the 1940s. 
The record on appeal, however, provides ample evidence that the District
has attempted to preserve historic irrigation use to the maximum extent
practicable, including evidence that: 
current consumptive use of the BS-VP Aquifer is unsustainable, with
63,000 acre-feet per year as the long-term average amount of groundwater
available, thus requiring all users to reduce their consumption; the Aquifer
recovered during decreased use during the 1980s; and that throughout most of
the designated historic use period the BS-VP Aquifer was within the elevation
of 3,570 to 3,580 feet found to be sustainable. 
Therefore, we reject this portion of Guitar L.P.=s
challenge, as well as its overall challenge that the District exceeded its
statutory authority under Chapter 36 when it adopted rules regarding production
limitations that consider a landowner=s
prior use of groundwater for irrigation purposes during a specific historic use
period.

We turn next to
Guitar L.P.=s
contention that the District exceeded its authority under Chapter 36 when it
adopted transfer rules that are not authorized by Section 36.113(e) because
they impose more restrictive permit conditions on non-EHIL landowners and are
arbitrary and discriminatory. 
Essentially, Guitar L.P. attacks the District=s
linkage of a landowner=s
allocation of groundwater under a validation or operating permit to the amount
of his groundwater allocation for transfer purposes, and in so arguing, claims
that this linkage imposes a Amore
restrictive permit condition@
within the meaning of Section 36.113(e) that applies only to non-EHIL
landowners.








We first address
Guitar L.P.=s
indirect challenge to the District=s
authority to link its issuance of transfer permits to a landowner=s production permits.  Section 36.122 governs the transfer of
groundwater outside of a district=s
boundaries.  See Tex.Water Code Ann. ' 36.122.  As we previously noted, under Section
36.122(a), if a Section 36.113 permit application or permit amendment proposes
the transfer of groundwater outside a district=s
boundaries, the district may also consider the provisions of Section 36.122 in
determining whether to grant or deny the permit or permit amendment.  Tex.Water
Code Ann. '
36.122(a).  The statute clearly
authorizes a groundwater district to promulgate rules requiring a landowner to
obtain a permit or permit amendment for the transfer of groundwater out of the
district.  See Tex.Water Code Ann. ' 36.122(a), (b).  However, except as provided in Section
36.113(e), the district may not impose more restrictive permit conditions on
transporters than the district imposes on existing in-district users.  Tex.Water
Code Ann. '
36.122(c).  By its plain language, the
statute authorizes a district to establish a separate permit for water
transfers, but it also permits a district to consider the provisions in
Section 36.122 when determining whether to grant or deny any permits under
Section 36.113 generally.  See Tex.Water Code Ann. '' 36.122(a), 36.113(a).  Thus, there is nothing in Section 36.122 that
requires a district to issue a transfer permit independently or without
considering its determinations under a landowner=s
production permit. 

Relying on Section
36.113(e), Guitar L.P. contends that the linkage of transfer permit groundwater
allocation to a landowner=s
groundwater allocation under his validation or operating permit imposes Amore restrictive permit conditions@ on holders of operating permits and
non-EHIL validation permits who wish to transfer their water out of the
district.  That is, it asserts, the
different criteria or terms that landowners must satisfy to obtain validation
and operating permits are carried forward when they apply for transfer permits,
and as a result are, in effect, Arestrictive@ conditions that do not apply to EHIL
landowners.  By Adifferent
criteria@ or Aterms@
we understand Guitar L.P. to be arguing that the District=s determination of historic irrigation
groundwater use during the designated ten and one-half year existing and
historic use period is the restrictive condition.  We conclude, however, that Guitar L.P.=s reliance on Section 36.113(e) as the
basis of its attack on the District=s
transfer provisions is misplaced.








As we noted
before, Section 36.113 governs the permitting of wells.  Tex.Water
Code Ann. '
36.113(a).  When granting or denying a
permit, the district must consider inter alia: whether the proposed use
of water unreasonably affects existing groundwater and surface water resources
or existing permit holders; whether the proposed use of water is dedicated to
any beneficial use; and whether the proposed use of water is consistent with
the district=s
certified water management plan.  See
Tex.Water Code Ann. ' 36.113(d).  Former Section 36.113(e) provided that:

The district may impose more
restrictive permit conditions on new permit applications and increased use by
historic users if the limitations:

 

(1)        apply to all subsequent new permit applications
and increased use by historic users, regardless of type or location of use;

 

(2)        bear a reasonable relationship to the
existing district management plan; and 

 

(3)        are reasonably necessary to protect
existing use.

 

Tex.Water Code Ann.
' 36.113(e)(2001).

 








In essence, Guitar
L.P. argues that because no landowner had ever transferred water outside the
District at the time the 2002 Rules were adopted, all of the transfer permit
applications the District considered were Asubsequent
new permit applications@
for the purposes of Section 36.113(e)(1) and therefore, the District=s rules which link a non-EHIL landowner=s groundwater allocation for transfer
purposes to the amount allowable by his underlying validation or operating
permit (which is substantially less than the allocation awarded to EHIL
farmers), constitutes a more restrictive transfer permit condition that is not
applied to EHIL farmers=
transfer permit applications.  Guitar
L.P. contends that District=s
transfer rules are thus impermissible under Section 36.113(e).








We conclude,
however, that Section 36.113(e) is not applicable in this case.  When read in the context of the other
provisions within Section 36.113, it is readily apparent that Subsection (e)
merely functions as a protective measure, by which the Legislature has granted
groundwater districts express authority to alter its permitting systems to
impose Amore,@ that is, additional, restrictive
permit conditions on new permit applications and increased use by
historic users, subject to certain qualifications listed in Subsection
(e)(1)-(3) if future circumstances arise that warrant adjustments.  We must agree with the District that this
statutory provision serves as a safety valve for groundwater districts, in that
it authorizes a district in later phases of groundwater regulation to Astep up@
its regulatory efforts in order to conserve and protect its groundwater
resources.[11]  Therefore, assuming, without deciding that
having to satisfy the criteria for issuance of an underlying validation or
operating permit, which presumably is a permit that offers EHIL-like water
allocation, is a Arestrictive
permit condition@ for
non-EHIL transfer permit applicants, we find that Section 36.113(e) does not
come into play until a district decides to require more, and perhaps tighter,
restrictions within its permitting system to new applicants or to historic
users who seek to increase their use.  We
find it of little import that as Guitar L.P. asserts in this case, no landowner
had ever transferred water outside the district.  We decide that this fact, standing alone,
simply does not make all transfer permit applications Asubsequent
new permit applications@
under the District=s
existing permitting system.  We agree
with the District that Section 36.113(e) does not address front-end
distinctions between the types of permits issued under the District=s current regulatory scheme for local
groundwater development and conservation. 
Given this conclusion, we need not reach Guitar L.P.=s specific arguments regarding Section
36.113(e)(3).  Issues One and Three are
overruled.

EQUAL
PROTECTION

In its second
issue, Guitar L.P. argues that both facially and as-applied to Guitar L.P., the
District=s transfer
rules violate its right to equal protection under the United States
and Texas Constitutions because they treat Guitar L.P. differently than other,
similarly-situated landowners.  See
U.S. Const. amend. XIV, ' 1; Tex.
Const. art. 1, '
3.

Standard
of Review

We review Guitar
L.P.=s equal
protection challenge to the District=s
transfer rules under a rational basis test. 
See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440,
105 S.Ct. 3249, 3254‑55, 87 L.Ed.2d 313 (1985); see also City of New
Orleans v. Dukes, 427 U.S. 297, 303‑04, 96 S.Ct. 2513, 2516‑17,
49 L.Ed.2d 511 (1976); Barshop v. Medina Cty. Underground Water Conservation
Dist., 925 S.W.2d 618, 631‑32 (Tex.
1996).  Under this test, the District=s regulatory classification need only
be rationally related to a legitimate state purpose or interest to survive an
equal protection challenge.  See City
of Cleburne, 473 U.S. at 439-40, 105 S.Ct. at 3254; Barshop,
925 S.W.2d at 631.








Essentially,
Guitar L.P.=s equal
protection challenge rests on its claim that the District=s transfer rules grant preferential
treatment to EHIL farmers, that is, landowners who irrigated their land during
the ten and one-half year historic use period, because they receive greater
allocations of groundwater by virtue of their underlying validation permits
over non-EHIL landowners who hold either validation or operating permits, which
respectively entitle them to comparably smaller allocations based on prior
non-irrigation historic use or no allocation until the BS-VP Aquifer reaches a
certain average water elevation.  Guitar
L.P. asserts that EHIL farmers and non-EHIL landowners are similarly situated
because neither class of landowner has ever transferred water outside the
District.  Moreover, Guitar contends that
the classification in the District=s
transfer rules, which is based on the application of the historic use period,
is not rationally related to any legitimate governmental purpose.  We must ultimately disagree.








The Texas
Constitution mandates that the Legislature preserve and conserve the natural
resources of this state.  See Tex.Const. art. 16, ' 59. 
Pursuant to Article 16, section 59(b), Legislature has created
groundwater districts, which it has determined are the state=s preferred method of groundwater
management.  Tex.Water Code Ann. '
36.0015.  The Legislature requires that a
district develop a comprehensive management plan in accordance with Section
36.1071.  According to the District=s management plan, 63,000 acre-feet per
year is the long-term average amount of groundwater available for consumptive
use or transfer from the District from the BS-VP Aquifer, 63,000 acre-feet is
the long-term average amount of groundwater recharge from lateral inflow, and
approximately 27,000 acre-feet of recharge results from deep percolation of
irrigation water.  The plan states that
the Far West Texas Approved Regional Water Plan has determined that total
maximum groundwater production in the Dell Valley
aquifer system needs to be equivalent with recharge in order to maintain a
balance.  In terms of groundwater supply
management, the plan provides that the District will manage groundwater
production from the BS-VP Aquifer in a Asustainable
manner@ and that
it will Aidentify
and engage in such practices, that if implemented, would result in more
efficient use of groundwater.@  As previously mentioned, the plan states as
its management objective for natural resources as follows:

The amount of groundwater withdrawals
permitted by the District shall be consistent with the long-term sustainable
amount of recharge to the portion of the aquifer within the District and to
protect the historical and existing uses of groundwater withdrawn from the
portion of the Bone Spring-Victorio Peak aquifer located within the District.

 

The District=s operating and validation permitting
rules protect historic use of groundwater for irrigation purposes while taking
into account the average water elevation of the BS-VP Aquifer in groundwater
production and withdrawal.  We think that
is undeniable.  See District Loc. Rules 6.10, 6.12,
3.5.  In order to implement what we find
to be a production permitting scheme that is based on legitimate state
purposes, namely, limiting groundwater withdrawals in a sustainable manner
while protecting historical and existing uses of that groundwater, the District
implemented the disputed ten and one-half year existing and historic use
period.  Given the integral role this
historic period plays in affecting the District=s
legitimate goals, we must likewise conclude that the designated historic period
is rationally related to the District=s
preservation goals.

Having determined
that the underlying production permitting system is rationally related to a
legitimate governmental purpose, we turn to the remainder of Guitar L.P.=s equal protection challenge.  The crux of Guitar L.P.=s complaint is that for transfer
permitting, the District has no rational basis for discriminating between
otherwise similarly-situated landowners in order to protect the Aquifer or to
protect historic use of groundwater for irrigation purposes because EHIL
landowners have by that point effectively converted their historic type of use
by requesting a transfer permit to export their groundwater allocation outside
the district.








As previously
discussed, the District requires all landowners to obtain a transfer permit in
order to transfer any groundwater produced or withdrawn within the
district.  District Loc. Rule 6.13(j). 
It also requires that transfer applicants hold either validation or
operating permits.  District Loc. Rule 6.13(j).  These rules apply to all landowners
alike.  The problem, however, is that
water allocation for transfer permits is determined by the amount allocated
under the underlying production permit.  See
District Loc. Rule 3.7.  Thus, the non-EHIL/EHIL classification that
Guitar L.P. protests occurs at the earlier production limitations phase of
permitting.  Consequently, the transfer
rules do not Agive@ greater allocations of groundwater to
EHIL landowners than what is allocated to other landowners, but rather the
transfer rules incorporate the production limitations that are already
legitimately in place.  Despite Guitar
L.P.=s
contentions, the District=s
decision to adopt the pre-established groundwater production and withdrawal
limitations does further the District=s
legitimate goal of limiting annual groundwater withdrawals for all non-exempt
wells as the primary means of protecting the average water elevation level of
the BS-VP Aquifer in a sustainable manner.[12]









Finally, Guitar
L.P. also complains that the transfer rules allow EHIL landowners to Aconvert their existing use of
groundwater for irrigation purposes to future transfer uses without satisfying
any additional permitting conditions and without regard to the water level of
the BSVP Aquifer.@  However, the District=s
transfer permit rules subject historic irrigation users to a leaching fraction
reduction equal to 0.30 of the volume of the irrigation water that would have
been applied to the land.  See District Loc. Rule 3.7, 1.1.  This restriction is certainly in keeping with
the District=s goal of
protecting the BS-VP Aquifer by maintaining its level of recharge, despite the
inevitable loss of some irrigation groundwater within the district for
out-of-district use.  See Tex.Water Code Ann. ' 36.122 (the district may not adopt
rules expressly prohibiting the export of groundwater).  Because the District=s
transfer permit rules do not deprive Guitar L.P. of equal protection under the United States
and Texas Constitutions, we overrule Issue Two.

VESTED
RIGHTS STATUTE

In Guitar L.P.=s fourth issue, it contends that the
District violated its vested rights by considering its permit applications
under the District=s 2002
Rules rather than its 1990 Rules that were in effect at the time Guitar L.P.
filed its applications.  Specifically,
Guitar L.P. asserts that former Section 245.002(a) of the Texas Local
Government Code required that the District consider its groundwater permit
applications under the 1990 Rules.

Former Section
245.002(a), Uniformity of Requirements, contained in Chapter 245 of the Local
Government Code provided that:








Each regulatory agency shall consider
the approval, disapproval, or conditional approval of an application for a
permit solely on the basis of any orders, regulations, ordinances, rules,
expiration dates, or other properly adopted requirements in effect at the time
the original application for the permit is filed.

 

Acts of 1999, 76th Leg., R.S., ch.
73, ' 2, 1999 Tex.Gen.Laws 431, 432, now codified at Tex.Loc.Gov=t
Code Ann. '
245.002(a)(Vernon 2005).

With certain
exceptions, Chapter 245 applies only to a project in progress on or commenced
after September 1, 1997.  See Tex.Loc.Gov=t
Code Ann. ''
245.003, 245.004.  (Vernon 2005).  AProject@ is defined as Aan
endeavor over which a regulatory agency exerts its jurisdiction and for which
one or more permits are required to initiate, continue, or complete the
endeavor.@  See id. at '
245.001(3).  A Aregulatory
agency@ means Athe governing body of, or a bureau,
department, division, board, commission, or other agency of, a political
subdivision acting in its capacity of processing, approving, or issuing a
permit.@  Id.
at ' 245.001(4).

Guitar L.P. argues
that its Aproject@ triggered the protections of Section
245.002 because it A>endeavored=,
among other things, to validate its existing wells and to transport water
outside the boundaries of the District.@  Further, Guitar L.P. asserts that the
District Aextert[ed]
jurisdiction@ over its
endeavor by assuming jurisdiction over the permit applications, which were
required to complete their endeavor.








The Legislature
has specified that Chapter 36 Aprevails
over any other law in conflict or inconsistent with this chapter, except any
special law governing a specific district . . . .@   Tex.Water
Code Ann. ' 36.052
(Vernon 2000).  In this case, application
of Chapter 245 would be inconsistent with Chapter 36 because it would require
the District to apply old rules that are no longer valid and that otherwise
conflict with the regulatory requirements mandated under Chapter 36, as amended
in 1997 and 2001.  For example, Chapter
36 requires the District to develop a comprehensive management plan to address,
as applicable:  provision of the most
efficient use of groundwater; control and prevention of groundwater waste;
control and prevention of subsidence; conjunctive surface water management issues;
drought conditions; and conservation.  Tex.Water Code Ann. ' 36.1071.  Under Chapter 36, a district must adopt rules
necessary to implement the management plan. 
Tex.Water Code Ann. ' 36.1071(f).  Further, before granting or denying a permit,
the District must consider whether Athe
proposed use of the water is consistent with the district=s certified water management plan.@ 
Tex.Water Code Ann. ' 36.113(d)(4); see also Tex.Water Code Ann. ' 36.122(f)(3)(AIn
reviewing a proposed transfer of groundwater out of the district, the district
shall consider . . . the approved regional water plan and certified district
management plan.@).  None of the District=s
1990 Rules regarding well permitting or groundwater transfer are keyed to the
District=s
management plan, which as previously discussed, requires that the amount of
groundwater withdrawals permitted must be consistent with the long-term
sustainable amount of recharge to the BS-VP Aquifer.

Likewise, the
District=s old
rules regarding out-of-district groundwater transfer violate the regulatory
requirements mandated by Chapter 36. 
Section 36.122(c) prohibits the District from imposing more restrictive
permit conditions on transporters than on in-district users.  See Tex.Water
Code Ann. '
36.122(c).  The old rules, however, do
just that.  In particular, old District
Rule 3.024(10) provided that:








Such [transport] application shall not
be approved unless the Board of Directors finds and determines that the
transporting of water for use outside the District applied for will not
substantially affect the quantity and quality of water available to any person
or property within the District; that all other feasible sources of water
available to the person requesting a permit have been developed and used to the
fullest; that no other liquid could be feasibly substituted for the use of
fresh ground water; and that the proposed use, or any part of the proposed use
will not constitute waste as defined under the laws of the State of Texas.  In evaluating the application, the District
shall consider the quantity of water proposed to be transported; whether the
ultimate destination of the water is within the recharge zone of the aquifer,
thus promoting recharge of the aquifer; the term for which the transporting is
requested; the safety of the proposed transportation facilities with respect to
the contamination of the aquifer; the nature of the proposed use; whether the
withdrawal of the groundwater requested is reasonable; whether such withdrawal
is contrary to the conservation and use of groundwater; whether the use of the
water to be transferred is for beneficial purposes; whether alternative
supplies are available; whether the transfer will negatively affect the surface
and groundwater users near the proposed well sites; and such transfer is not
otherwise detrimental to the public welfare.

 

See District
Loc. Rule 3.024(10)(1990).

 

None of these
onerous requirements applied to in-district users.  Subsection 10 of old District Local Rule
3.024 clearly conflicts with Section 36.122(c). 
Guitar L.P. argues that even if this conflict exists, only those
provisions in old Rule 3.024 that squarely conflict with Section 36.122 would
be invalid and the remaining provisions would survive because the 1990 Rules
include a severability clause.  See
District Loc. Rule
5.001(a)(1990)(Athe
invalidity does not affect other provision or applications of the rule which
can be given effect without the invalid provision or application . . . .@).








Generally, when a
statute contains a provision of severability, that provision prevails in
interpreting the statute.  See Tex.Gov=t Code Ann. '
311.032(a)(Vernon 2005).  However, a
severability clause will save the valid provisions of an otherwise invalid
statute only if the remaining valid portion is capable of being executed in
accordance with the apparent legislative intent independently of the invalid
portion of the statute.  See Board of
Trustees of Emp. Retirement System of Tex. v. Farrar, 236 S.W.2d 663, 666
(Tex.Civ.App.--Austin), affirmed by, 150 Tex. 572, 243 S.W.2d 688 (Tex.
1951)(even if an act contains a severability clause, if the valid and invalid
portions of an act are so interwoven that they cannot be separated so as to
leave a complete act capable of being executed in accordance with the
legislative intent, the entire act is invalid). 
Likewise under contract law, when the provision of an agreement to be
severed is integral to the entire agreement, a severability clause, standing
alone, cannot save the agreement.  See
John R. Ray & Sons, Inc. v. Stroman, 923 S.W.2d 80, 87 (Tex.App.‑-Houston
[14th Dist.] 1996, writ denied).  In this
case, subsection 10 of the District=s
old Rule 3.024 plainly states that no transport application will be approved
unless the District=s board
makes the requisite findings contained in subsection 10, making the
remaining  provisions of the rule
inextricably intermingled to compliance with this invalid portion.  See District
Loc. Rule 3.024(10)(1990). 
Therefore, we reject Guitar L.P.=s
contention that the District=s
old Rule 3.024 does not conflict with the mandatory requirements of Section
36.122.  

We determine that
Chapter 36 more specifically governs the duties and powers of groundwater
districts and that application of Chapter 245 in this case would be wholly
inconsistent with the mandatory regulatory requirements contained in Chapter
36.  Under these circumstances, Chapter
36 supersedes Chapter 245 and controls over the District=s
application of its 2002 Rules in determining Guitar L.P.=s
pending permit applications.  See
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 901 (Tex. 2000)(under traditional statutory
construction rules, the more specific statute controls over the more
general).  Issue Four is overruled.

THE
DISTRICT=S
CROSS-APPEAL








By cross-appeal,
the District raises three issues, in which it contends the trial court erred:
in denying its request for attorney and expert witness fees and other incurred
costs; in ruling in favor of Guitar L.P. on its claim for a partial refund of
administrative fees; and in assessing 25 percent of the court costs
against the District.

The District
argues that the trial court=s
failure to order Guitar L.P. to pay the District=s
stipulated attorney and expert witness fees, as well as its costs in preparing
the administrative record for filing with the trial court, is contrary to the
plain directive of Section 36.066(g).  We
agree.

Section 36.066(g)
provides, in pertinent part:

If the district
prevails in any suit other than a suit in which it voluntarily intervenes, the
district may seek and the court shall grant, in the same action, recovery for
attorney=s fees,
costs for expert witnesses, and other costs incurred by the district before the
court.  The amount of the attorney=s fees shall be fixed by the court.

 

Tex.Water Code Ann.' 36.066(g).

 








Guitar L.P.
asserts that Section 36.066(g) is limited to qualifying Asuits@ and that as a matter of statutory
construction, Section 36.066(g) does not apply to suits, such as this case,
which are, in effect, administrative appeals. 
In so arguing, Guitar L.P. points to Section 36.102(d), which provides
for attorney fees in any suit to enforce its rules and argues that if the
District is correct, the mandatory award under Section 36.102(d) is mere
statutory surplusage.  See Tex.Water Code Ann. ' 36.102(d).  Guitar L.P. claims that because Section
36.102(d) applies to a Asuit
to enforce [a water district=s]
rules,@ it
follows that Section 36.066(g) cannot apply to every type of suit to which the
District may be a party.  Therefore,
harmonizing Section 36.066(g) and Section 36.102(d) requires the Court to
determine the type of suit to which Section 36.066(g) applies.  According to Guitar L.P., Section 36.066(g)
is limited to the types of suits mentioned within Section 36.066, not judicial
challenges to the rules or appeals of administrative rule-making and
adjudicatory decisions, as Guitar L.P. describes this case.

Here, Guitar L.P.
filed suit to challenge the validity of the District=s
rules after all its administrative appeals to the District were final.[13]  By its plain reading, there is nothing in
Section 36.066(g) that limits the type of Asuits@ for which the District can seek and
recover its attorney fees, expert witness costs, and other costs.  Moreover, nothing in the provision excludes
the suits described in Section 35.251. 
This construction of Section 36.066(g) is not inconsistent with other
provisions in Chapter 36, including Section 36.102(d).  Indeed, Section 36.102(d) merely clarifies
that the District may recover these costs in the enforcement proceedings
described in Section 36.102.  Further, as
the District rightly points out, it would not be a redundant provision in all
cases, for example, a district may voluntarily intervene in another action,
like a citizen=s suit
under Section 36.119 for the purpose of enforcing its rules.  Under that circumstance, voluntarily
intervening in a suit would preclude attorney=s
fees under Section 36.066(g), but such fees would be recoverable under Section
36.102(d).  Thus, we conclude Section
36.066(g) clearly applies to Guitar L.P.=s
suit and is mandatory.








Applying Section
36.066(g), the District asserts that it should be treated as the prevailing
party in the consolidated cases because the trial court ruled in its favor as
to Guitar L.P.=s
principal challenges.  Specifically, the
District asserts that it won outright on the merits in Guitar I, II,
and IV and in Guitar III (Guitar L.P.=s
administrative appeal challenging the Board=s
decision to grant its permit applications), the District prevailed on the
principal issue of the case, that is, whether the District legally applied its
rules to Guitar L.P.=s
permit application, and prevailed in the bulk of Guitar L.P.=s challenges to the District=s fee assessments against it.  In reply, Guitar L.P. asserts that even if
Section 36.066(g) applies, the District did not wholly prevail in all of the
appeals, arguing that because Section 36.066(g) does not contain any language
that would allow the District to recover its attorney fees in a case where it Asubstantially prevails@ or Aprevails
on any disputed issue,@
then it may only recover attorney fees if it prevails in the entire suit.

Courts have
typically described a Aprevailing
party@ as the
party to a suit that either successfully prosecutes the action or successfully
defends against it, prevailing on the main issue.  See Flagship Hotel, Ltd. v. City of Galveston,
117 S.W.3d 552, 564-65 (Tex.App.--Texarkana 2003, pet. denied); Hawkins v.
Ehler, 100 S.W.3d 534, 544 (Tex.App.--Fort Worth 2003, no pet.); F.D.I.C.
v. Graham, 882 S.W.2d 890, 900 (Tex.App.--Houston [14th Dist.] 1994, no
writ).  Thus, the prevailing party is the
party vindicated by the judgment rendered. 
See Brown v. Fullenweider, 135 S.W.3d 340, 347
(Tex.App.--Texarkana 2004, pet. denied), citing Dear v. City of Irving, 902 S.W.2d
731, 739 (Tex.App.--Austin 1995, writ denied).








Clearly, the main
issue in the litigation between the parties was the validity of the District=s rules and its permit decisions.  The trial court rendered a judgment in favor
of the District on all of Guitar L.P.=s
claims, with the exception of ordering a partial refund of administrative fees,
which Guitar L.P. had incurred during the permitting proceedings.  The District was without doubt the prevailing
party in the litigation as it successfully defended against Guitar L.P. on the
main issues of the four cases brought by Guitar L.P.

Guitar L.P.,
however, argues that the District waived any complaint about attorney fees
because it failed to segregate those fees among the four separate cases in the
trial court.  Specifically, Guitar L.P.
claims that the District had a duty to segregate the fees among the cases
because each appeal involved a unique set of facts and issues.  We disagree.








Generally, the
party seeking to recover attorney=s
fees carries the burden of proof and must show that the fees were incurred on a
claim that allows recovery of such fees and, thus, is ordinarily required to
segregate fees by claim when there are multiple claims which may or may not
allow the recovery of such fees.  See
Stewart Title Guaranty Co. v. Sterling, 822 S.W.2d 1, 10-11 (Tex. 1991); Z.A.O.,
Inc. v. Yarbrough Drive Ctr. Joint Venture, 50 S.W.3d 531, 550‑51
(Tex.App.‑-El Paso 2001, no pet.). 
However, in this case, the District was entitled to recover attorney
fees as to all of the claims Guitar asserted, not just some of them.  Therefore, it had no duty to segregate the
fees.  Even if the District was under a
duty to segregate, there is a recognized exception to the duty to segregate
fees when the attorney=s
fees rendered are in connection with multiple claims arising out of the same
transaction.  Sterling, 822 S.W.2d at 11. When the
claims are dependent upon the same set of facts or circumstances and thus are A>intertwined
to the point of being inseparable,=
the party suing for attorney=s
fees may recover the entire amount covering all claims.@  Id.
at 11.  Here, the claims asserted inter
alia the validity of the District=s
rules, the particular challenges to the District=s
permit application decisions in application of its rules, and fee assessment
challenges, were substantially interrelated and arose from similar facts and
theories of law.  We conclude the
District=s
attorney and expert witness fees could not have been practicably segregated
among the cases.  For the reasons stated
above, the District was entitled to recover the stipulated attorney and expert
witness fees.








In its brief, the
District also contends that it is entitled to recover the cost of copying the
administrative record that was filed with the district court as part of its Aother costs@
under Section 36.066(g).  Guitar L.P.
asserts in response that costs associated with the administrative record are
not Acourt
costs,@
therefore the District cannot recover these costs under Section 36.066(g).  To support its contention, Guitar L.P. relies
on City of Manvel v. Texas Dep=t
of Health Resources, 573 S.W.2d 825 (Tex.Civ.App.--Beaumont 1978, writ ref=d n.r.e.), in which the Court held that
costs of producing the administrative record in an administrative appeal are
not to be treated as assessable court costs. 
Further, Guitar L.P. claims that Acosts@ is a term of art that specifically
means Acourt
costs@ and that
Section 36.066(g) should not be read as to expand its meaning.  Under Guitar L.P.=s
interpretation, Aother
costs@ in
Section 36.066(g) is limited to Acourt
costs,@ which
does not include the costs of producing the administrative record.  We find Guitar L.P.=s
argument unpersuasive and its reliance on City of Manvel misplaced.  In City of Manvel, the state agency sought to
recover the cost of preparing the administrative record under Tex.R.Civ.P. 131.  See
 City of Manvel,
573 S.W.2d at 828.  The City of Manvel Court
found that Rule 131 Acosts@ did not extend to administrative
record preparation in the absence of statutory language directing
otherwise.  See id. at
828-29.  Unlike City of Manvel, the statute
at issue here expressly provides for other costs.  By its plain language, Section 36.066(g)
would include all other costs, without limitation to costs incurred at the
trial court level.  Therefore, we agree
that in this case, the District was entitled to recover the cost of preparing
the administrative record for filing with the district court.  Because the trial court erred in failing to
award the District its reasonable attorney fees and expert witness fees, as
well as the other costs it incurred in preparing the administrative record for
court filing, pursuant to Section 36.066(g), we sustain the District=s first cross-issue.

In its next
cross-issue, the District argues that the trial court=s
order in Guitar III that it refund Guitar L.P. $9,399.34 in
administrative fees is contrary to substantial evidence in the administrative
record that supports the District=s
assessment of its administrative fees against Guitar L.P. in the permitting
proceedings.

Section 36.253
provides for review of a groundwater district=s
decisions under the substantial evidence rule. 
See Tex.Water Code Ann.
' 36.253; see also Tex.Gov=t Code Ann. '
2001.174 (Vernon 2000).  Under the
substantial evidence rule, the reviewing court is not to substitute its judgment
on the weight of the evidence for that of the agency=s.  City of El Paso v. Pub. Util. Comm=n, 883 S.W.2d 179, 185 (Tex. 1994); see also Tex. Gov=t Code Ann. ' 2001.174.  The agency=s
order is presumed valid and the complaining party bears the burden of showing
that it was not supported by substantial evidence.  Id.; Hammack
v. Public Util. Comm=n
of Texas,
131 S.W.3d 713, 725 (Tex.App.‑-Austin 2004, pet. denied).  AAt
its core, the substantial evidence rule is a reasonableness test or a rational
basis test@; if the
order is reasonable, we do not concern ourselves with its correctness.  City of El Paso, 883 S.W.2d at 185, citing
Railroad Comm=n
of Texas v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 41 (Tex.
1991).  The substantial evidence review
requires A>only more than a mere scintilla=@
to uphold the order.  Montgomery Indep. Sch. Dist. v. Davis, 34 S.W.3d 559, 566 (Tex. 2000). 
That is, the evidence may actually preponderate against the agency=s decision, yet amount to substantial
evidence, if some reasonable basis exists in the record for the agency=s action.  City of El Paso, 883 S.W.2d at 185.








Under Section
36.205(a), a district may set fees for administrative acts of the district,
such as filing applications.  See Tex.Water Code Ann. ' 36.205(a).  Fees set by a district may not unreasonably
exceed the cost to the district of performing the administrative function for
which the fee is charged.  Id.  The District has established rules on
assessment of administrative fees pursuant to the authority granted in Section
36.205(a).  Specifically, District Local
Rule 8.1 authorizes the Board to set reasonable fees for administrative acts
such as reviewing and processing permits and conducting permit hearings, as
long as the fees do not unreasonably exceed the cost to the District for such
matters.  District Loc. Rule 8.1. 
Rule 8.4 requires an applicant whose validation, operational, or
transfer permit has been determined to be administratively complete by the
Board to deposit with the District an amount determined by the Board to cover
the cost associated with an uncontested or contested hearing regarding the
permit.  District Loc. Rule 8.4. 
This advance deposit Ashall
be sufficient to pay for the cost of public notices, legal fees, expert fees,
hearing facility rental fees, and other expenses.@  Id.  The remaining deposit balance, if any, is
refundable following approval of the permit. 
Moreover, the applicant may be required to deposit additional funds if
the amount of the original deposit is expended prior to the Board=s action on the permit.  Id.








In this case,
Guitar L.P. claimed that the District undercredited Guitar L.P. $5,600 in
deposits and overcharged Guitar L.P. $3,720.44 in expenses, for a total of
$9,320.44.[14]  Guitar L.P. contends the trial court rightly
determined that there was no substantial evidence to support the District=s refusal to refund these under-credits
and overcharges.

First, Guitar L.P.
claims that it was entitled to a $5,600 credit for two Adeposits@ it made on October 29, 2002 and on
November 1, 2002, for $4,300 and $1,300, respectively.  However, the record clearly showed that these
amounts were paid to the District as flat fees to administratively process Guitar
L.P.=s two
permitting applications.  Because these
were flat fee amounts, not deposits to a Adeposit
account,@ as
Guitar L.P. claims, Guitar L.P.=s
contention concerning under-crediting is without merit.

Next, Guitar L.P.
claims that in the underlying bills related to the permitting proceedings, the
District improperly assessed some of its attorney and expert consultant fees
against Guitar L.P.  Guitar L.P. argues
that it was overcharged $1,358.73 ($450 and $908.73) for the attorney fees the
District incurred for attorney Renea Hicks. 
The record shows that the District had agreed at the administrative
level that Guitar L.P. was overcharged $450 for Hicks=
May 2003 statement, and this amount was subsumed in later assessable fees and
expenses for Hicks= services
in 2004, which amounted to $1,820.30. 
Guitar L.P. also claims an overcharge of $908.73, arguing that Hicks= December 26, 2003 statement shows that
he only worked a total of 0.7 hours for the District and that this work was not
attributable to administrative matters. 
However, Hicks=
December 26, 2003 statement attached to General Manager Randy Barker=s affidavit provides evidence that
Hicks performed 3.7 hours on Guitar L.P.=s
administrative proceedings, which with related expenses totaled $908.73.  With regard to Guitar L.P.=s complaint about overcharges in the
amounts of $71.33, $256.60, and $949.77 for the District=s
fees incurred for attorney Timothy Brown=s
work, there is evidence in the record to support the total costs assessed for
his services, namely Brown=s
cover letters which designated the attributable parties.








Finally, Guitar
L.P.=s claim
of overcharges for Al Blair=s
services to the District is also without merit. 
Blair=s
invoices plainly show that the District incurred the disputed amounts of
$609.01 and $475, which were attributable to Guitar L.P.=s
administrative proceedings.  We decline
to accept Guitar L.P.=s
tortured comparative reading of Blair=s
invoices and Brown=s
statements for their services over the same time period.  Because Guitar L.P. failed to show there was
a lack of substantial evidence regarding the District=s
assessment of fees against Guitar L.P. at the administrative level, the trial
court erred in ordering the $9,399.34 refund. 
Cross-Issue Two is sustained.

In its third and
final cross-issue, the District argues that the trial court erred in assessing
25 percent of the court costs against the District because it was the
successful party in Guitar I-III. 
Specifically, the District contends that Guitar L.P. should have paid
all the court costs and that the trial court failed to find good cause for
apportioning the court costs as required by Rule 141 of the Texas Rules of
Civil Procedure.








Absent an abuse of
discretion, the trial court=s
assessment of costs will not be reversed. 
Seelbach v. Clubb, 7 S.W.3d 749, 764 (Tex.App.--Texarkana 1999,
pet. denied).  Rule 131 of the Texas
Rules of Civil Procedure provide that A[t]he
successful party to a suit shall recover of his adversary all costs incurred
therein . . . .@  Tex.R.Civ.P.
131.  Under Rule 141, the trial court Amay, for good cause, to be stated on
the record, adjudge the costs otherwise than as provided by law or these rules.@ 
Tex.R.Civ.P. 141.  We find that the District has failed to
preserve its issue regarding taxation of costs because it failed to make a
timely objection.  See Tex.R.App.P. 33.1(a)(1).  Relying on City of Irving v. Dallas/Forth
Worth Int=l Airport
Bd., 894 S.W.2d 456 (Tex.App.--Fort Worth 1995, writ denied), the District
argues that Rule 131 establishes its entitlement to costs and thus, no motion
is required in order for them to be awarded. 
Indeed, the City of
 Irving Court held that Rule 131 entitles the
prevailing party to an award of costs regardless of whether they moved for
them.  City of Irving, 894 S.W.2d at 470-71.  City of Irving, however, is silent on
the waiver issue presented here.  We
conclude that the District has waived its complaint on the trial court=s adjudication of costs.  Cross-Issue Three is overruled.

For the reasons
stated above, we reverse the trial court=s
judgments as to the denial of the District=s
attorneys= fees,
expert witness fees, and other costs and as to the partial refund order in the
amount of $9,399.34 for administrative costs and remand the cases to the trial
court for further proceedings consistent with this opinion.  In all other respects, the trial court=s judgments are affirmed.

 

 

August
31, 2006

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.











[1]
Pursuant to an existing Rule 11 Agreement of the parties, Guitar L.P.=s drilling permits are not at issue in
this appeal.





[2]
Every groundwater district must develop a comprehensive management plan and
must adopt rules necessary to implement the management plan.  See Tex.Water
Code Ann. ' 36.1071(a),
(f).





[3]
An exemption applies to wells used solely for domestic use or for providing
water for livestock or poultry on a tract of land larger than 10 acres that is
either drilled, completed or equipped so that it is incapable of producing more
than 25,000 gallons of groundwater a day. 
See Tex.Water Code Ann.
' 36.117(b)(1).  Further a district cannot restrict the
production of any well that is exempt from permitting under Subsection
b(1).  Id. at '
36.117(c).





[4]
In 2005, the Legislature also added Amanaged
depletion@ as an
allowable method for production limitation. 
Acts of 2005, 79th Leg., R.S., ch. 970, '
12, 2005 Tex.Gen.Laws 3247, 3258,
now codified at Tex.Water Code Ann.
' 36.116 (a)(2).





[5]
Section 36.116(b) has been amended effective September 1, 2005, to state as
follows:  AIn
promulgating any rules limiting groundwater production, the district may
preserve historic or existing use before the effective date of the rules to the
maximum extent practicable consistent with the district=s
comprehensive management plan under Section 36.1071 and as provided by Section
36.113.@  Acts of 2005, 79th Leg., R.S., ch. 970, ' 12, 2005 Tex.Gen.Laws 3247, 3580, now codified at Tex.Water Code Ann. ' 36.116(b).





[6]
In 2005, the Legislature amended Section 36.113(e), substituting Apermit amendment applications to
increase@ for Aincreased.@  Acts of 2005, 79th Leg., R.S., ch 970, ' 10, 2005 Tex.Gen.Laws 3247, 3256-57, now codified at Tex.Water Code Ann. ' 36.113(e).





[7]
Groundwater use for ranching is protected by exemption of wells for this
purpose.  Thus, ranchers can continue to
use groundwater produced by their wells for their existing purposes without
having to undergo the permitting process or have their consumption
reduced.  See District Loc. Rule 7 (giving these
wells the highest priority in the system).





[8]
The rules provide that a transfer permit application can be submitted and
considered concurrently with an application for a validation permit, an
operating permit or amendment to such permits. 
District Loc. Rule
6.13(k).





[9]
In its management plan, the District determined that the annual amount of
groundwater being consumptively used within the District in 2001 was estimated
to be 75,600 acre-feet.  The best
available information, however, suggested that 63,000 acre-feet per year is the
long-term average amount of groundwater available for consumptive use or
transfer from the District from the BS-VP Aquifer.  The plan=s
objectives include the goal that the District will manage the production of
groundwater from the BS-VP Aquifer within the District in a sustainable
manner.  Specifically, the plan states
that the management objective is as follows: 
AThe
amount of groundwater withdrawals permitted by the District shall be consistent
with the long-term sustainable amount of recharge to the portion of the aquifer
within the District and to protect the historical and existing uses of
groundwater withdrawn from the portion of the Bone Spring-Victorio Peak aquifer
located within the District.@  See also Tex.Water Code Ann. ' 36.1071(f)(AThe district shall adopt rules
necessary to implement the management plan.@).





[10]
Although not controlling here, we do note that the Legislature has recently
amended Chapter 36, defining AEvidence
of historic or existing use@
to mean Aevidence
that is material and relevant to a determination of the amount of groundwater
beneficially used without waste by a permit applicant during the relevant time
period set by district rule that regulates groundwater based on historic use.@ 
Acts of 2005, 79th Leg., R.S., ch. 970, '
2, 2005 Tex.Gen.Laws 3247,
3249-50, now codified at Tex.Water Code
Ann. '
36.001(29).





[11]
Moreover, this interpretation is consistent with provisions contained within
Section 36.122, which permit a district to promulgate rules requiring a person
to obtain a transfer permit or permit amendment under Section 36.113 to
transfer groundwater out of the district on or after March 2, 1997 under a new
arrangement, but prohibit a district from imposing more restrictive permit
conditions on transporters than those imposed on existing in-district users, except
as provided in Section 36.113(e).  See
Tex.Water Code Ann. ' 36.122(a)-(c).





[12]
We also note that the District=s
decision is also consistent with Section 36.122(f), which provides:

 

In reviewing a proposed transfer of
groundwater out of the district, the district shall consider:

 

(1)        the availability of water in the
district and in the proposed receiving area during the period for which the
water supply is requested;

 

(2)        the projected effect of the proposed
transfer on aquifer conditions, depletion, subsidence, or effects on existing
permit holders or other groundwater users within the district; and

 

(3)        the approved regional water plan and
certified district management plan.

 

Tex.Water Code Ann. '
36.122(f); see also Tex.Water
Code Ann. '
36.122(g), (k).





[13]
Section 36.251, Suit Against District:

 

A person, firm, corporation, or association
of persons affected by and dissatisfied with any provision or with any rule or
order made by a district is entitled to file a suit against the district or its
directors to challenge the validity of the law, rule, or order.  The suit shall be filed in a court of
competent jurisdiction in any county in which the district or any part of the
district is located.  The suit may only
be filed after all administrative appeals to the district are final. Tex.Water Code Ann.' 36.251.





[14]
Guitar L.P. concedes that the total of all its alleged under-credits and
overcharges is less than the amount the District was ordered to refund.  Also, Guitar does not challenge the District=s fee structure for permitting
applications nor does it challenge the District=s
method of assessing its attorney and expert consultant fees in the permitting
process.