# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00321-CV

---

**Sheryl Schey and Tim Schey, Appellants**

**v.**

**Eric Copper and KWI-1, Ltd., Appellees**

---

### FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY
### NO. C-1-CV-21-002525, THE HONORABLE TODD T. WONG, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This dispute is between residential property buyers and a real-estate agent and broker. Sheryl and Tim Schey,[1] the buyers, appeal from the trial court's final judgment that incorporated its summary-judgment rulings in favor of appellees Eric Copper and KWI-1, Ltd., the agent and broker, on appellees' claim for breach of contract against the Scheys. In three issues, the Scheys argue that the trial court erred in granting summary judgment in appellees' favor because: (i) appellees did not suffer damages that were compensable under the parties' agreement, (ii) they did not show a causal link between their alleged loss and the damages awarded, and (iii) there was a material fact issue concerning whether they exerted their "best efforts."

---

[1] Because they share the same last name, we refer to appellants individually by their first names.

For the following reasons, we reverse the trial court's final judgment, render judgment that appellees take nothing on their claim for breach of contract, reverse the award of attorney's fees and costs to appellees, and remand the case to the trial court for consideration of the Scheys' claim for attorney's fees and costs.

## BACKGROUND[2]

**The Scheys' Search and Purchase of Property**

In late 2020, the Scheys, who were living in California, began looking for a house to buy in the Austin area. On December 21, 2020, Sheryl emailed Copper about "needing an agent in Austin." She explained that she "found [him] through a google search and thought [he] might be a good fit for [them]." On December 30, she sent Copper a list of possible properties that she had reviewed on Zillow, and on January 2 and 3, 2021, the Scheys travelled to Austin and viewed properties with Copper.

Around six weeks later, Sheryl contacted Copper about a listing that she had found on Petticoat Lane in Austin. Copper walked the property using his phone video to show it to her, and on February 16, 2021, the Scheys with Copper's assistance signed a "back-up" contract on the property (the Petticoat Contract) that was contingent on the termination of a pending contract for the sale of the property. Among the terms of the Petticoat Contract, the Scheys agreed to pay $3,350,000 at closing, and the contract included a "Termination Option": for $1, the seller granted the Scheys "the unrestricted right to terminate this contract by giving notice of termination to Seller within 7 days after the Effective Date of this contract (Option Period)." Around the same time, the Scheys and Copper signed a form "Residential

---

[2] The facts are taken from undisputed summary-judgment evidence.

2

Buyer/Tenant Representation Agreement" (the Representation Agreement), in which the Scheys granted Copper "the exclusive right to act as [their] real estate agent for the purpose of acquiring property in the market area," which was the Austin metropolitan area.[3]

After the pending contract on the Petticoat Lane property was terminated, the Petticoat Contract became the primary contract for the purchase of the property. Around February 25, 2021, the Scheys travelled to Austin and, based on their in-person tour of the property and the inspection reports, became concerned about the property's condition. In response to the Scheys' concerns, Copper drafted an amendment to the Petticoat Contract, which the seller agreed to, that extended the Option Period until March 3, 2021. With Copper's assistance, the Scheys terminated the contract on that date, and their escrow money was returned to them. After the termination of the contract, the Scheys and Copper did not communicate for a few weeks.

During the Option Period of the Petticoat Contract, the Scheys had contacted another real estate agent who began assisting them in their search for a property to buy. According to Copper, the Scheys did not notify the agent about the Representation Agreement or the Petticoat Contract. Although the Scheys did not sign a representation agreement with the other agent, on March 13, 2021, the Scheys signed a contract to purchase a home on Blanco River Ranch Road in San Marcos and listed the other agent on the contract. When their purchase of the San Marcos property closed on May 7, 2021, the other agent was paid a commission by the seller of that property.

_____

[3] In his deposition, Copper testified that the area that the Scheys communicated to him was "primarily" the Westlake area, which is in the Austin metropolitan area.

**Representation Agreement**

At the center of the parties' dispute is the Representation Agreement between the Scheys and Copper. On this form contract, the Scheys are referred to as "Client" and Copper as the Broker's associate and authorized agent. From February 12 to May 31, 2021, Client granted Broker "the exclusive right to act as Client's real estate agent for the purpose of acquiring property in the market area," which area was defined to mean "that area in the State of Texas within the perimeter boundaries of the following areas," but the form was left blank as to what the "following areas" were.

The Representation Agreement also stated that Broker would receive a commission of 3% of the gross sales price "if Client agrees to purchase property in the market area," that Broker would seek to obtain payment of this commission from the seller or other agents, and that "[a] person [was] not obligated to pay Broker a commission until such time as Broker's commission [was] *earned and payable*." Broker's commission was "*earned*" when "Client enters into a contract to buy property in the market area" or "breaches this agreement," and Broker's commission was "*payable*, either during the term of this agreement or after it ends, upon the earlier of: (1) the closing of the transaction to acquire the property, (2) Client's breach of a contract to buy . . . a property in the market area, or (3) Client's breach of this agreement." The agreement defined "'[c]losing' in a sale transaction" to mean "the date legal title to a property is conveyed to a purchaser of property under a contract to buy."

The Representation Agreement further provides for the recovery of attorney's fees and costs to "the prevailing party in any legal proceeding brought as a result of a dispute under this agreement or any transaction related to this agreement," and addresses the remedy for a default by Client or Broker:

4

If either party fails to comply with this agreement or makes a false representation in this agreement, the non-complying party is in default. If Client is in default, Client will be liable for the amount of compensation that Broker would have received under this agreement if Client was not in default. If Broker is in default, Client may exercise any remedy at law.

As to the parties' obligations, Client agreed to:

(a) work exclusively through Broker in acquiring property in the market area and negotiate the acquisition of property in the market area only through Broker; (b) inform other brokers, salespersons, sellers and landlords with whom Client may have contact that Broker exclusively represents Client for the purpose of acquiring property in the market area and refer all such persons to Broker; and (c) comply with other provisions of this agreement.

Broker agreed to "use Broker's best efforts to assist Client in acquiring property in the market area," to "assist Client in negotiating the acquisition of property in the market area," and to "comply with other provisions of this agreement."

**Litigation**

After sending a demand letter, in June 2021, appellees filed their original petition against the Scheys seeking damages for breach of the Representation Agreement. Appellees initially sought damages in the amount of the commission that was paid to the other agent when the sale of the San Marcos property closed, but they changed their theory of recovery to seek damages of $100,500, which is the amount of commission that appellees would have been paid if the sale of the Petticoat Lane property in Austin had closed.[4]

---

[4] The summary-judgment evidence included excerpts from Copper's deposition in which he confirmed that the San Marcos property was outside the market area that he was searching on the Scheys' behalf:

Q.     So the house [the Scheys] ended up buying was outside the market area that you understood to be the area you were looking for, for the Scheys, is that correct?

5

In September 2023, appellees filed a traditional motion for summary judgment, contending that the undisputed evidence established that they had fully performed under the Representation Agreement by facilitating the Petticoat Contract and that the Scheys had breached the agreement by "contacting and working with another realtor less than twenty-four hours after going under contract for the purchase of the Petticoat Property" (within twenty-four hours of when they became in the "first position" on the property). Appellees did not dispute that the Scheys had the unrestricted right to terminate the Petticoat Contract during the Option Period and that they properly did so. Appellees argued that they were owed the 3% commission of $100,500 because the commission "became earned and payable" when the Scheys breached the Representation Agreement by contacting the other real estate agent "while they were still under contract" to purchase the Petticoat Lane property. Appellees further argued that the evidence established that they had used their "best efforts" to locate a suitable property for the Scheys and that they had "found a suitable property for the Scheys, i.e.[,] the Petticoat Property." They also reserved the right to recover their attorney's fees.

Appellees' evidence in support of their motion was Copper's affidavit; copies of Sheryl's December 2020 email to Copper and February 27, 2021 emails between Sheryl and Copper; the Representation Agreement; the Petticoat Contract; copies of text messages between Tim and the other agent; the inspection reports on the Petticoat Lane property; the notice of the termination of the Petticoat Contract; excerpts from the depositions of Sheryl, Tim, and the other

---

A.       That's correct.

He explained that "there was no property that [Sheryl] sent that was indicative of them being willing to go to San Marcos, which is a completely different community and not Austin. That's a different city." When asked how he would characterize what he agreed to do for the Scheys, he testified that he "agreed to assist them in the purchase of a home in Austin."

6

agent; the contract on the San Marcos property; and appellees' demand letter and the Scheys' response to that letter. In his affidavit, Copper averred that he "fully performed all of [his] duties under the Representation Agreement," outlining his actions in representing the Scheys and stating that he was "completely unaware that the Scheys were at all unhappy with [his] services until they notified him in March 2021 that they were under contract to purchase another property and would not give [him] any details about it." He also averred that mid-March was when he discovered that "the Scheys had hired another agent and gone under contract to purchase a property somewhere in Central Texas."

In October 2023, the Scheys filed a no-evidence motion for summary judgment challenging the damages element of appellees' claim for breach of contract.[5] Relying on the provision in the Representation Agreement stating the remedies for default, the Scheys argued that appellees "have no evidence that the acts of communicating with another broker *resulted* in any damages to [them]." Because the Petticoat Contract was terminated during the Option Period, the Scheys argued, it "was not an enforceable contract entitling anyone to commission." The Scheys requested that the trial court grant their motion and enter judgment that appellees take nothing on their claim. They also reserved the right to seek attorney's fees and costs pursuant to the Representation Agreement.

The parties filed responses to the others' motions for summary judgment, and the Scheys filed a reply to appellees' response. In response to the Scheys' no-evidence motion for summary judgment, appellees relied on evidence that they had filed to support their traditional

---

[5] In November 2022, the Scheys filed a traditional motion for summary judgment and, in March 2023, a no-evidence motion for summary judgment in supplementation of their traditional motion for summary judgment on the element of breach. In May 2023, the trial court denied those motions.

motion for summary judgment, including the Representation Agreement. The Scheys' evidence in response to appellees' traditional motion for summary judgment included the release of the earnest money on the Petticoat Lane property, excerpts from Copper's deposition, and Sheryl's affidavit.

Sheryl averred that: (i) she found the listing on Petticoat Lane and called Copper about it; (ii) he "urged" them to make an offer on the home but "did not tell [them] about the extensive amount of deferred maintenance and required repairs readily apparent to an in-person observer"; (iii) based on his "positive spin," they submitted an offer on the property; (iv) she "was immensely displeased with the manner in which [he] presented the [Representation] Agreement," but she and Tim signed it and understood they were bound by it; and (v) after touring the property for "an hour," they realized "the house was filled with tons of deferred maintenance issues," they "had offered too much for the property," and Copper had not been "forthcoming, transparent, nor acted as a fiduciary on [their] behalf when he shared his assessments as [they] submitted the offer." The property inspector told Sheryl that "he would not buy the property." After the Petticoat Contract was terminated, Sheryl "assumed [Copper] had abandoned [them] because she did not hear from him for several weeks. According to Sheryl, from December 30, 2020, to March 13, 2021, Copper identified only five possible properties, and they did not fit the Scheys' criteria.

The trial court granted appellees' motion for traditional summary judgment and denied the Scheys' no-evidence motion for summary judgment. The trial court awarded appellees $100,500 in damages, as well as post-judgment interest, and reserved judgment as to appellees' claim for attorney's fees. The trial court's final judgment incorporated the interlocutory summary-judgment order that awarded appellees $100,500 plus post-judgment

8

interest, found that they were the prevailing parties, and awarded them $32,900.56 in attorney's fees and costs.

The Scheys filed a motion for new trial, which was overruled by operation of law, and this appeal followed.

## ANALYSIS

### Standard of Review

The Scheys challenge the trial court's summary-judgment rulings, which we review de novo. *See Farmers Grp. v. Geter*, 620 S.W.3d 702, 708 (Tex. 2021) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). Under this standard, we view "the evidence in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022) (quoting *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019)). When both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, "the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered." *Dorsett*, 164 S.W.3d at 661 (citing *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000)).

In this case, appellees filed a traditional motion for summary judgment, and the Scheys filed a no-evidence motion for summary judgment. A traditional summary judgment is appropriate when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law on the issues presented. Tex. R. Civ. P. 166a(c). A movant seeking a

no-evidence summary judgment must assert that "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." *Id.* R. 166a(i). "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact" on the challenged elements. *Id.*; *see JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021). "A genuine issue of material fact exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

The Scheys' issues also require us to interpret the Representation Agreement, which we conclude is unambiguous.[6] *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (explaining that deciding whether contract is ambiguous is question of law for court and that "contract is unambiguous if it can be given a definite or certain legal meaning"). "The interpretation of an unambiguous contract is a question of law for the court." *Geter*, 620 S.W.3d at 709 (citing *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999)). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson*, 128 S.W.3d at 229. "To achieve this objective, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* And we generally "give terms their plain, ordinary, and generally accepted meaning unless the instrument

---

[6] The parties do not contend that the Representation Agreement is ambiguous.

shows that the parties used them in a technical or different sense." *Geter*, 620 S.W.3d at 709 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

**Evidence of Damages**

In their first and second issues, the Scheys argue that the trial court erred in granting summary judgment on appellees' claim for breach of contract because appellees "suffered no damages compensable under the terms of the parties' contract" and appellees "cannot show a causal link between the alleged loss and the damages sought." The Scheys argue that there was no evidence of "any harm" caused by their communications with the other agent during the exclusivity period in the Representation Agreement.

The elements of a claim for breach of contract are "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018). The Scheys' first two issues are directed to the final element, which required appellees to establish a causal connection between the Scheys' alleged breach—their communications with the other agent—and the damages that appellees sought. *See Southern Elec. Servs. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("[The absence of a causal connection between the alleged breach and the damages sought will preclude recovery."); *Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 215 (Tex. App.—El Paso 2010, pet. denied) (explaining that final element of claim for breach of contract includes "causation

11

requirement" and that plaintiff must show it suffered monetary injury as result of defendant's breach).

Appellees argue that the proper measure of their damages was the commission on the agreed purchase price in the Petticoat Contract because: (i) when the Scheys breached the Representation Agreement by communicating with the other agent, the Petticoat Contract was in effect and (ii) the Scheys' subsequent refusal to pay the commission caused appellees damages. According to appellees, the "undisputed summary judgment evidence" established that all conditions precedent to their recovery of the amount of the commission were satisfied and that they were damaged by the Scheys' refusal to pay the commission that "had become earned and payable."

Appellees rely on the provision of the Representation Agreement defining when Broker's commission was "earned and payable":

> Earned and Payable: A person is not obligated to pay Broker a commission until such time as Broker's commission is *earned and payable*. Broker's commission is *earned* when: (1) Client enters into a contract to buy or lease property in the market area, or (2) Client breaches this agreement. Broker's commission is *payable*, either during the term of this agreement or after it ends, upon the earlier of: (1) the closing of the transaction to acquire the property; (2) Client's breach of a contract to buy or lease a property in the market area; or (3) Client's breach of this agreement.

Under this provision, appellees argue that the Scheys' breach of the Representation Agreement— the communications with the other agent during the option period of the Petticoat Contract— "made the commission 'earned' and 'payable'"; that at the time of the Scheys' breach, appellees "could reasonably expect" to receive the commission on the Petticoat Contract; and that the Scheys' refusal to pay the commission after it became "earned and payable constituted a default of the Representation Agreement." They argue, "Nothing in the Representation Agreement

imposes the condition that the clients' property purchase be outside of the 'option period' for the commission to be recoverable."

We consider this provision defining when Broker's commission becomes earned and payable in the context of the entire agreement. *See J.M. Davidson*, 128 S.W.3d at 229. The provision, which is in the section of the Representation Agreement addressing "Broker's fees," refers to the obligation of "[a] person" to pay a commission to Broker, and another provision in that section requires Broker to seek to obtain payment of the commission from the seller or their agent. Giving effect to these provisions supports that the parties did not intend for Client to be liable to Broker for a commission without an actual property sale or Client's breach of a contract of sale. *See, e.g., Seelbach v. Clubb*, 7 S.W.3d 749, 756 (Tex. App.—Texarkana 1999, pet. denied) (contrasting language in contract of sale with agreement to sell and explaining that agreement to sell real property is agreement for "sale in the future, either absolutely or on the happening of some contingency or the performance of some condition").

Requiring an actual property sale or Client's breach of a contract of sale also harmonizes and gives meaning to the default provision, which states: "If Client is in default, Client will be liable for the amount of compensation that Broker would have received under this agreement if Client was not in default." *See J.M. Davidson*, 128 S.W.3d at 229. Assuming that the Scheys were in default of the Representation Agreement when they communicated with the other agent, the plain language of the default provision makes clear that the Scheys were liable to appellees only for the amount of compensation that appellees would have received under the agreement had the Scheys not communicated with the other agent. *See id.* And the evidence was undisputed that after seeing the Petticoat Lane property in person and reviewing the

13

inspection reports, the Scheys decided, within their unrestricted right to do so and for reasons unrelated to their communications with the other agent, to terminate the Petticoat Contract.

With Copper's assistance, the Scheys provided notice of termination of the Petticoat Contract within the option period—by March 3, 2021—and they received their earnest money back. *See, e.g.*, *Rollingwood Tr. No. 10 v. Schuhmann*, 984 S.W.2d 312, 315 (Tex. App.—Austin 1998, no pet.) (explaining that option contract gives optionee right to elect to purchase property at stated terms within specified time but with no obligation to do so). In this context, applying the unambiguous terms of the Representation Agreement, we conclude that the Scheys were not liable for the commission on the cancelled Petticoat Contract because the evidence established that appellees would not have received that amount regardless of whether the Scheys communicated with the other agent. *See Tidwell Props., Inc. v. American First Nat'l Bank*, No. 14-04-00120-CV, 2006 Tex. App. LEXIS 608, at *8–10 (Tex. App.—Houston [14th Dist.] Jan. 26, 2006, no pet.) (mem. op.) (holding that defendant's failure to disclose sublease did not cause plaintiff bank's breach-of-contract damages because bank's deal with third party fell through for reasons "unrelated to" failure to disclose). Under the terms of the Representation Agreement, the parties' agreed measure of damages if the Scheys defaulted was "the amount of compensation that Broker would have received under this agreement if Client was not in default" and based on the undisputed evidence, that amount was zero.

Applying the plain language of the parties' agreed measure of damages to the undisputed evidence, we conclude as a matter of law that the cancelled Petticoat Contract was not evidence of a monetary loss that was caused by the Scheys' communications with the other agent. *See Pagosa Oil & Gas*, 323 S.W.3d at 215; *see also Buchanan v. Compass Bank*, No. 02-14-00034-CV, 2015 Tex. App. LEXIS 372, *5–6 (Tex. App.—Fort Worth Jan. 15, 2015,

14

pet. denied) (mem. op.) (concluding that appellant had not raised fact issue regarding how appellee's breach of Rule 11 agreement caused complained-of injury (citing *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App.—El Paso 1998, pet. denied) ("The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery.")).

We also observe that appellees did not offer evidence to show an alternative measure of damages based on the Scheys' communications with the other agent. *See, e.g.*, *Toth v. Sears Home Improvement Prods., Inc.*, 557 S.W.3d 142, 158 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (concluding in context of motion to dismiss brought under Texas Citizens Participation Act that "Sears did not establish a prima facie case of an essential element of its breach of contract claim against Toth" because "Sears did not attempt to quantify any measure of its purported damages or show with evidence how its settlement with [third party] . . . would have been different had Toth not breached the agreement by the conduct Sears alleges," which alleged conduct included Toth's communications with third party). For example, by the time of the summary judgment motions, appellees no longer sought as their measure of damages the amount of the commission on the sale of the San Marcos property.[7]

As support for their contention that the Representation Agreement did not require the Petticoat Contract to be outside the "option period" before their right to receive the commission on that contract became due and payable, appellees rely on the opinions in *Kelley v. Dunn*, 620 S.W.2d 825 (Tex. App.—Tyler 1981, no writ); *Fuess v. Mueller*, 630 S.W.2d 715 (Tex. App.—Houston [1st Dist.] 1982, no writ); and *Cooper v. Wildman*, 528 S.W.2d 80 (Tex.

---

[7] In their brief, appellees state, "The Petticoat Contract provides the only potential contract with which to measure Appellees' damages for the Scheys' default because it was the only contract for purchase of property which Appellees could expect compensation from."

15

App.—Corpus Christi–Edinburg 1975, no writ), but the disputes in those cases are not analogous because they were between owners who were selling their property and brokers. In *Dunn*, the appellate court affirmed a broker's claim for a commission against the owner of a farm who mutually agreed with the buyer to rescind the sale, but the broker did not appeal from the take-nothing judgment in favor of the buyer of the farm. 620 S.W.2d at 828. The property owner and the buyer had entered into a second contract for the sale of the farm without the broker's knowledge, and the buyer bought the farm under the second contract. *See id.* In this context, the court applied the rule against the property owner that "a broker who produces or procures a purchaser who is able and willing to buy on the owner's terms is entitled to his commission if completion of the sale is prevented by fault of the owner, or by mutual recission of the contract by the owner and the purchaser." *Id.* at 829. Similarly, in the other two cases, the broker's claim for a commission was against the property owners, not the buyers of the property. *See Fuess*, 630 S.W.2d at 716; *Wildman*, 528 S.W.2d at 84.[8]

Viewing the evidence under the applicable standard of review, we conclude that appellees did not present evidence of damages that were caused by the Scheys' communications with the other agent during the exclusivity period of the Representation Agreement or while the Petticoat Contract was in effect. *See* Tex. R. Civ. P. 166a(c), (i); *Zive*, 644 S.W.3d at 173. Thus, we sustain the Scheys' first and second issues and conclude that the trial court erred in granting

---

[8] We further observe that to the extent that a purchaser of property (and not the seller) is liable under the rule that a broker is entitled to a commission when the broker has produced a purchaser who is ready, willing, and able to purchase the property on the owner's stated terms, the evidence was undisputed that the Scheys were unwilling to purchase the Petticoat Lane property on the property owner's terms and that they terminated the Petticoat Contract by exercising the Termination Option. *See Fuess v. Mueller*, 630 S.W.2d 715, 717 (Tex. App.—Houston [1st Dist.] 1982, no writ).

appellees' traditional motion for summary judgment and denying the Scheys' no-evidence motion for summary judgment.[9]

## CONCLUSION

Because we have concluded that the trial court erred in its summary-judgment rulings, we reverse its final judgment, render judgment that appellees take nothing on their claim for breach of contract against the Scheys, reverse the award of attorney's fees and costs to appellees, and remand the case to the trial court for consideration of the Scheys' claim for attorney's fees and costs.[10]  *See Dorsett*, 164 S.W.3d at 661 (requiring appellate court to render judgment that trial court should have rendered when reversing summary judgment rulings on competing motions).

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Reversed and Rendered in Part; Reversed and Remanded in Part

Filed:  May 30, 2025

---

[9]  Because our resolution of the Scheys' first two issues is dispositive of this appeal, we do not reach their third issue contending that appellees breached the Representation Agreement by failing to exert their "best efforts" as promised in the Representation Agreement.  *See* Tex. R. App. P. 47.1.

[10]  In their no-evidence motion for summary judgment, the Scheys reserved their claim for attorney's fees and costs, and the Representation Agreement provides for the recovery of attorney's fees and costs to the "prevailing party in any legal proceeding brought as a result of a dispute under this agreement or any transaction related to this agreement."  This issue, therefore, remains for the trial court's consideration on remand.